**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**RODGER DALE MITCHELL,**

      **Petitioner,**

**v.**                                                    **Case No.: 2:15-cv-12156**


**KAREN PSZCZOLKOWSKI,
Warden, Northern Correctional Facility,**

      **Respondent.**


**<u>PROPOSED FINDINGS AND RECOMMENDATIONS</u>**

      Pending before the court are Petitioner's Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, (ECF No. 2); Petitioner's Motion to Allow Incorporation of Exhibit Q into Grounds E and H, Exhibits R and U into Ground 2D and Correction of Page 20, (ECF No. 29); Petitioner's Motion for a Ruling of Default, (ECF No. 30); Petitioner's letter-form motion to withdraw his Motion for a Ruling of Default, (ECF No. 31); Petitioner's Motion to Allow Incorporation of Vital and Necessary Information the Court Needs to Consider, (ECF No. 33); and Respondent's Motion for Summary Judgment, (ECF No. 10). This case is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and by standing order is referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

The undersigned **GRANTS** Petitioner's Motion to Allow Incorporation of Exhibit Q into Grounds E and H, Exhibits R and U into Ground 2D and Correction of Page 20, (ECF No. 29), and Petitioner's Motion to Allow Incorporation of Vital and Necessary Information the Court Needs to Consider, (ECF No. 33). The exhibits provided and the information cited by Petitioner have been considered in evaluating the pending issues. The undersigned also notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve this matter without need for an evidentiary hearing. *See* Rule 8, Rules Governing Section 2254 Cases.

After thorough consideration of the record, the undersigned conclusively **FINDS** that (1) there are no *material* factual issues in dispute and (2) Petitioner is not entitled to the relief requested. Therefore, for the reasons that follow, the undersigned respectfully **RECOMMENDS** that the District Court **GRANT** Respondent's Motion for Summary Judgment; **DENY** Petitioner's Petition for a Writ of Habeas Corpus; **GRANT** Petitioner's letter-form motion to withdraw his Motion for a Ruling of Default; **DENY** Petitioner's Motion for a Ruling of Default as **withdrawn**; and **DISMISS** this case from the docket of the Court.

I.     **Relevant Facts and Procedural History**

    **A. Indictment, Trial, and Direct Appeal**

In 2001, Petitioner Rodger Dale Mitchell ("Mitchell") was indicted by a Jackson County, West Virginia grand jury on five counts of sexual abuse by a parent, guardian, or custodian; two counts of contributing to the delinquency of a minor; two counts of battery; and two counts of assault. (ECF No. 10-1 at 4). The indictment alleged that Mitchell committed these acts against his girlfriend's children, with whom he resided at the time of the charged crimes. (*Id.*) Realizing that two of the counts contained the wrong

victim's name, the State subsequently moved to amend the indictment. (*Id.* at 4-5). At the same time, Mitchell's trial counsel, George Cosenza, moved to dismiss the indictment for other purported defects. (*Id.*) The trial court granted the defense's motion, dismissing the indictment without prejudice. (*Id.*)

In June 2002, Mitchell was indicted by a Jackson County grand jury for physically and sexually abusing his girlfriend's children. (*Id.*) Specifically, the indictment charged Mitchell with six counts of sexual abuse by a custodian, contrary to West Virginia Code § 61-8D-5; six counts of child abuse creating a substantial risk of serious bodily injury, contrary to West Virginia Code § 61-8D-3(c); and three counts of child abuse resulting in bodily injury, contrary to West Virginia Code § 61-8D-3(a). Counts 1, 2, 3, 4, and 5 of the indictment alleged that Mitchell sexually abused his girlfriend's fourteen-year-old daughter, C.O., in March 2000 by touching her breasts on the inside and outside of her clothing and touching her sex organs with both his hands and mouth.[1] (ECF No. 10-11 at 151; ECF No. 10-12 at 9-12; ECF No. 26-2 at 25). Count 6 alleged that Mitchell sexually abused C.O. on a day between June 2000 and June 2001, when C.O. was fifteen or sixteen years old, by having C.O. touch his penis. (ECF No. 10-12 at 12). Count 7 alleged that Mitchell committed child abuse creating a substantial risk of serious bodily injury on a day between June 2000 and 2001 when he tied C.O.'s hands and legs together, and he placed a plastic bag over her head. (*Id.* at 13-14). Count 8 alleged that Mitchell created a substantial risk of serious bodily injury to C.O. by again tying her hands and legs together and pouring lighter fluid on her clothing, which he lit. (*Id.* at 14-15). Count 9 alleged that Mitchell physically abused C.O. on a day between September 1999 and June 2000, which

---

[1] Because the victims were minors at the time of the crimes, the undersigned uses their initials. *See* L.R. Civ. P. 5.2.1(a).

resulted in bodily injury. (*Id.* at 19). Counts 10, 11, and 12 alleged that Mitchell committed child abuse creating a substantial risk of serious injury by placing a plastic bag over the head of V.O., one of C.O.'s brothers, and also put lighter fluid on V.O.'s clothes and lit it. (*Id.* at 15-17). Counts 13 and 14 alleged that Mitchell physically abused V.O. on a day between September 1999 and June 2000, which resulted in bodily injury. (ECF No. 10-11 at 183-86; ECF No. 10-12 at 19-20). Lastly, Count 15 alleged that Mitchell committed child abuse creating a substantial risk of serious injury by tying together the hands and legs of C.O.'s twin brother, W.O., and poured lighter fluid on his clothes, which he lit. (ECF No. 10-12 at 17-18).

Jill Perez, a Child Protective Services worker for the West Virginia Department of Health and Human Resources, testified before the grand jury in June 2002. (ECF No. 10-13 at 4). Ms. Perez became involved in the case and interviewed the children after receiving a call from a cousin of the children who was concerned about things she had heard from the children.[2] (*Id.* at 20). Ms. Perez stated that C.O., V.O., and W.O. lived with their mother and Mitchell in Ripley, West Virginia from December 1998 until May 2001. (*Id.* at 5-6). During an interview, C.O. informed Ms. Perez that Mitchell had sexually abused her. (*Id.* at 6, 10). According to Ms. Perez, Mitchell permitted C.O. to stay home from school for a day in March 2000, so that she, along with V.O., could drink alcohol with Mitchell. (*Id.* at 8). Ms. Perez remarked that school records demonstrated C.O. and V.O. missed one day of school together in March 2000. (*Id.* at 9). C.O. told Ms. Perez that Mitchell would pay the children one quarter or fifty cents for every alcoholic drink they

---

[2] The trial transcript reveals that C.O. was interviewed by Ms. Perez and Office Clyde Kenny of the Ripley City Police Department on three separate occasions. Two of the interviews occurred on the same day in April 2001, and the third interview took place in May 2001. W.O. and V.O. were separately interviewed on two occasions by the same investigators: once in April 2001 and once in May 2001.

could consume. (*Id.*) By the end of the drinking session that day, C.O. and V.O. each had ten dollars. (*Id.* at 9-10). At that point, C.O. was drunk and fell asleep on the couch in a downstairs room. (*Id.* at 10). Ms. Perez testified that Mitchell carried C.O. upstairs to her bedroom and touched her breasts through her clothing. (*Id.*) Mitchell also touched C.O.'s breasts on the inside of her clothing, and he made contact with her vagina using his hand and mouth. (*Id.*) Thereafter, Mitchell warned C.O. not to tell her mother about what had occurred, otherwise C.O.'s mother would "probably" commit suicide. (*Id.* at 12). Ms. Perez also recounted C.O.'s statement that Mitchell made her touch his penis in June 2000. (*Id.* at 11-12).

In addition, Ms. Perez described a "game" that Mitchell played with C.O., V.O., and W.O. called "Is there a God?" (*Id.* at 13). During the "game," Mitchell would tie the children's hands and feet together behind them and perform various cruel acts against them. (*Id.*) For instance, Mr. Perez testified that Mitchell placed a plastic bag over C.O.'s head while she was tied up and explained to her that, "If there is a God, God will help you." (*Id.* at 13-14). Mitchell also poured lighter fluid on C.O.'s clothing and set it on fire while C.O. was tied up. (*Id.* at 14). C.O. told Ms. Perez that she would try to roll around to extinguish the flames and that Mitchell would put out the fire before she suffered any burns. (*Id.* at 15). Ms. Perez indicated that Mitchell did the same to both V.O. and W.O. after tying them up. (*Id.* at 15-16). Aside from these incidents, Ms. Perez also testified that C.O. and V.O. reported being struck by Mitchell with a belt, which left them with bruises and welts (*Id.* at 17-18).

At a pretrial proceeding on July 18, 2002, defense counsel declined to challenge the sufficiency of the second indictment. (ECF No. 10-14 at 2). Defense counsel also indicated that he would not file a motion for discovery because he had already received

discovery in Mitchell's 2001 case, and he believed that the discovery in the instant case would be identical. (*Id.* at 3-4). In addition, defense counsel reasoned that, if he did not request discovery from the State, then he would not be obliged under the West Virginia Rules of Criminal Procedure to provide reciprocal discovery to the State. (*Id.* at 4). The trial court subsequently entered an order indicating that the State would only be required to produce exculpatory evidence and a grand jury transcript, as required by the West Virginia Rules of Criminal Procedure. (ECF No. 10-8 at 3). In October 2002, the attorney for the State sent a letter to defense counsel informing him that the discovery in the instant case was the same as the discovery in the 2001 case. (ECF No. 10-10 at 190-91).

Mitchell's trial began on November 12, 2002. (*Id.* at 2). Prior to opening statements, the State moved for, and defense counsel contested, the admission of other acts evidence under West Virginia Rule of Evidence 404(b). (*Id.* at 101-02). Specifically, the State moved to introduce evidence that Mitchell permitted C.O. and V.O. to miss school and drink alcohol in March 2000. (*Id.* at 102, 144, 151). In response to the motion, defense counsel moved for a continuance of the trial, arguing that the State's motion was filed the day before trial and that the defense did not have time to prepare a response to the State's motion. (*Id.* at 4-5). The trial court initially denied the motion for a continuance. (*Id.* at 5). Outside of the presence of the jury, the court permitted the State to offer witness testimony regarding the State's motion and allowed defense counsel to cross-examine the witnesses. After hearing the testimony of C.O. and V.O., and before ruling on the motion, the trial court granted a motion by defense counsel for a recess in order to further prepare a response to the State's 404(b) motion. (*Id.* at 159).[3] The

---

[3] Defense counsel's oral motion was made at page 157 of the trial transcript; however, that page is not contained in the electronic version of the transcript on CM/ECF.

following day, defense counsel presented the testimony of Lorena Mitchell, Mitchell's mother, in opposition to the State's motion. (*Id.* at 165). After hearing the testimony and arguments of the parties, the trial court ruled that the other acts evidence was admissible under West Virginia Rule of Evidence 403, and separately, Rule 404(b). (*Id.* at 184-89).

As its first witness, the State called W.O., who was seventeen years old at the time of trial. (*Id.* at 210-12). W.O. remembered that his mother and father divorced in 1991, and thereafter, W.O., his mother, C.O., and V.O. lived with Mitchell in Ohio. (*Id.* at 213-14). The five of them subsequently moved to Roane County, West Virginia in 1998 or 1999. (*Id.* at 214-15). After W.O. completed the sixth grade, they moved into a two-floor apartment in Ripley, West Virginia. (*Id.* at 215-16). W.O. recalled playing a "game" called "Is there a God?" with Mitchell on two occasions during the summer before he began the ninth grade. (*Id.* at 218-19). The first time, Mitchell tied W.O.'s arms and legs together with a rope and placed W.O. on the living room floor. (*Id.* at 219-21). According to W.O., Mitchell then placed lighter fluid on the middle of W.O.'s chest and ignited it. (*Id.* at 223-24). At that time, W.O.'s shirt caught fire, and he rolled on the ground to extinguish the flames. (*Id.* at 225). W.O. was not burned during the incident, and Mitchell later untied W.O. (*Id.* at 225-26). W.O. also recounted Mitchell playing the "game" with C.O. and V.O., which involved setting fires on their clothes or placing a plastic bag over V.O.'s head. (*Id.* at 226). W.O. acknowledged that he did not tell anyone other than his mother about the "game" until his second interview with Ms. Perez and Office Clyde Kenny of the Ripley City Police Department in May 2001. (*Id.* at 227). W.O. explained that he feared Mitchell would hurt him if he told anyone and described being threatened by Mitchell if he ever "turned [Mitchell] into the cops." (*Id.*) In addition, W.O. recalled a day in March 2000 when he went to school while C.O. and V.O. remained home with Mitchell. (*Id.* at 229).

- 7 -

When W.O. arrived home from school, he observed a bottle of liquor on the table and found C.O. and V.O. sleeping in their rooms. (*Id.* at 229-30).

On cross-examination, W.O. conceded that he did not remember the exact date when Mitchell tied him up and poured lighter fluid on him. (*Id.* at 234-35). W.O. testified that the fire did not damage the clothing that he was wearing, and he did not keep the clothing that he was wearing that day. (*Id.* at 239). W.O. reiterated that he did not tell anyone about Mitchell's actions or the "game" until his second interview with Ms. Perez and Officer Kenny. (*Id.* at 240-45). As such, W.O. admitted that he lied during his first interview with Ms. Perez and Officer Kenny in April 2001. (*Id.* at 242). W.O. conceded that, even at the second interview, he described "help[ing]" Mitchell during the "game," but told the interviewers that Mitchell never caught him when they were playing it. (*Id.* at 246). With respect to the day in March 2000 that both C.O. and V.O. missed school, W.O. acknowledged that he did not see his siblings drink alcohol that day and he could not tell whether they were drunk. (*Id.* at 247). W.O. also agreed that he did not like Mitchell "from time to time" as a result of how Mitchell treated W.O.'s mother. (*Id.* at 237). On redirect examination, W.O. elaborated on how Mitchell treated W.O.'s mother. (*Id.* at 250). W.O. indicated that he observed Mitchell hit his mother on two occasions when Mitchell was drunk. (*Id.*)

The State next called V.O., who was sixteen years old at the time of trial. (*Id.* at 252-53). V.O. testified that his mother and Mitchell began a relationship in 1992. (*Id.* at 254). V.O. recalled moving to Ripley, West Virginia when he was in the sixth grade. (*Id.* at 255). V.O. recounted being grounded for receiving bad grades as a seventh grader, which meant that V.O. would have to stay in his room after school until dinnertime. (*Id.* at 256-59). At one point during the period that V.O. was grounded, Mitchell discovered

that V.O. was outside of his room when he was not permitted to be. (*Id.* at 262). As a result, Mitchell struck V.O. with a belt four or five times on the back of the legs and buttocks, which left red marks on V.O.'s body that remained for four days. (*Id.* at 262-65). According to V.O., on a later occasion, Mitchell again hit him with a belt during the seventh grade for earning poor grades; however, Mitchell's two strikes did not leave any marks on V.O.'s body. (*Id.* at 266-67).

V.O. also testified regarding the "game" that Mitchell called "Is there a God?" (*Id.* at 267). During the summer before eighth grade, V.O. remembered an occasion when he was playing in the living room and was "caught" and held by W.O. (*Id.* at 269). While W.O. was holding V.O., Mitchell placed a plastic grocery bag over V.O.'s head, which caused V.O. difficulty breathing, and V.O. began to scream. (*Id.* at 269-71). After approximately thirty seconds, Mitchell removed the bag from V.O.'s head. (*Id.* at 272). On a separate occasion, Mitchell and W.O. tied V.O.'s hands and legs to his bed using an extension cord, and Mitchell again placed a plastic bag over V.O.'s head. (*Id.* at 273-75). After placing the bag over V.O.'s head, Mitchell told him, "If there is a God, then [he] would live." (*Id.* at 275). Similar to W.O.'s testimony, V.O. also recalled Mitchell playing the "game" with lighter fluid. (*Id.* at 276). V.O. specifically recalled Mitchell tying him and C.O. together with an extension cord in the living room of their apartment. (*Id.* at 276-78). Mitchell then poured lighter fluid on both V.O. and C.O. (*Id.* at 278). Mitchell poured the lighter fluid along the side of V.O.'s jeans and shirt. (*Id.* at 279). Thereafter, Mitchell ignited the fluid using a lighter, which caused "little flames" on V.O.'s pants and shirt. (*Id.* at 280-81). V.O. explained that Mitchell "knocked out" the flames with his hand before any damage to V.O.'s clothing was done. (*Id.* at 282). V.O. indicated that Mitchell also lit the

fluid on C.O.'s clothing. (*Id.*) Again, Mitchell remarked to V.O. that, if God existed, then God would help V.O. (*Id.*)

Additionally, V.O. recalled a day in March 2000 when he stayed home from school with Mitchell and C.O. (*Id.* at 283). On that day, Mitchell offered to let V.O. stay home from school if he would drink alcohol with Mitchell. (*Id.* at 284). V.O. testified that Mitchell would give him one quarter for each drink that he finished, and he made approximately five dollars that day. (*Id.* at 285-86). V.O. explained that the drinks were either vodka and orange juice or Seagram's Whiskey and Pepsi, and Mitchell mixed the drinks. (*Id.* at 285). V.O. indicated that C.O. also drank alcohol that day. (*Id.*) V.O. remembered that Mitchell's parents visited that day and that he spoke with them; however, he did not recall the details of the interaction. (*Id.* at 286-87). Eventually, V.O. and C.O. stopped drinking, and they both went to their rooms, at which point V.O. laid on his bed and fell asleep. (*Id.* at 287-88).

V.O. acceded that he was interviewed by Ms. Perez and Officer Kenny on two occasions and that he did not remember whether he told them about drinking with Mitchell or the "game" that Mitchell played with the children. (*Id.* at 289). At the time of the interviews, V.O. was living with his cousin. (*Id.*) He stated that he was afraid that he would have to return to live with Mitchell after the interviews and that Mitchell would discover what he told Ms. Perez and Officer Kenny, which would result in Mitchell beating him. (*Id.* at 290).

On cross-examination, V.O. conceded that he told Ms. Perez and Officer Kenny at the first interview that he did not drink with Mitchell. (ECF No. 10-11 at 7). In further describing the March 2000 drinking incident, V.O. testified that the drinking began in the morning and continued for three or four hours. (*Id.* at 8-9). V.O. did not disagree with

defense counsel's calculation that he must have consumed approximately twenty drinks if he received five dollars that day. (*Id.* at 10). In March 2000, V.O. weighed approximately 115 pounds. (*Id.* at 2). V.O. also indicated that the drinking stopped around noon because Mitchell's parents arrived. (*Id.* at 11-12). V.O. acknowledged that he spoke with Mitchell's parents for a matter of minutes before they left. (*Id.* at 12-13).

Regarding the "game" that Mitchell played with the children, V.O. testified that his shirt and jeans were not burned, and he did not keep the clothing that he was wearing at the time of the incident. (*Id.* at 16-17). After reviewing a transcript of his initial interview with Ms. Perez and Officer Kenny in April 2001, V.O. conceded that he did not tell them about the plastic bag being placed on his head by Mitchell. (*Id.* at 17-18). V.O. also acknowledged that, at the second interview with Ms. Perez and Officer Kenny in May 2001, he described being tied up using duct tape or rope, not an extension cord. (*Id.* at 19). On redirect examination, V.O. clarified that Mitchell used duct tape to tie him up on previous occasions about which he had not testified. (*Id.* at 21). V.O. described an incident when both he and C.O. were bound with duct tape and plastic bags were placed over their heads. (*Id.* at 22-23).

The State's third witness was C.O., who was seventeen years old at the time of trial. (*Id.* at 28-29). C.O. testified that her mother and Mitchell began living together when C.O. was seven years old. (*Id.* at 30). She stated that, when she was in the eighth grade, Mitchell struck her on the back of her legs with a belt because she let V.O. come out of his room while he was grounded. (*Id.* at 33-35). C.O. explained that the hits left "bluish marks" on the back of her legs that remained for two weeks; however, C.O. never showed those marks to anyone outside of her family. (*Id.* at 35-36, 88). C.O. also recalled being a part of the "Is there a God?" "game" during the summer before the ninth grade. (*Id.* at 36). C.O.

described one occasion when Mitchell tied her and V.O. together using ropes. (*Id.* at 37). She also recounted an instance when Mitchell tied her hands behind her back and poured lighter fluid on her pants, which he then lit. (*Id.* at 39). She stated that Mitchell eventually extinguished the fire, and she did not keep the pants that were ignited nor did she show the pants to anyone. (*Id.* at 39, 90).

C.O. also testified concerning the March 2000 incident. She stated that Mitchell agreed to let her and V.O. stay home from school if they would drink with Mitchell. (*Id.* at 41). According to C.O., Mitchell mixed strawberry daiquiris, piña coladas, and screwdrivers for her to drink. (*Id.* at 42). C.O. observed Mitchell pouring alcohol into the drinks when he mixed them. (*Id.*) She explained that she was given fifty cents for each drink that she consumed, and by the end of the drinking session, she had ten dollars. (*Id.* at 43, 63). C.O. acknowledged that Mitchell's parents visited that day, but did not recall how long they stayed or if she spoke with them. (*Id.* at 43). After she stopped drinking, C.O. sat on the couch. (*Id.* at 44). The next thing C.O. remembered was waking up in her bedroom and vomiting. (*Id.* at 44-45). Mitchell then entered her room and closed the door behind him. (*Id.* at 45-46). He approached C.O. and placed his hands on her breasts, on the outside of her clothing. (*Id.* at 46). C.O. testified that Mitchell next put his hand up her shirt and underneath her bra to feel her breasts. (*Id.*) After touching her breasts, Mitchell proceeded to take C.O.'s shorts and undergarments off. (*Id.* at 47). C.O. explained that Mitchell then touched her vagina with his hands and mouth. (*Id.*) Mitchell attempted to penetrate C.O. with his penis, but stopped when C.O. began crying. (*Id.* at 48). Mitchell then directed C.O. not to tell her mother what happened because her mother would commit suicide. (*Id.*)

C.O. admitted that she did not tell Ms. Perez and Officer Kenny about the March 2000 incident during her first two interviews with them, which occurred on the same day in April 2001. (*Id.* at 50, 72). C.O. expressed that she was scared if she reported what happened, then she would be taken away from her mother. (*Id.* at 50). The following month, C.O. was interviewed a third time by Ms. Perez and Officer Kenny, during which she described what happened in March 2000. (*Id.* at 51).

C.O. also described an incident in June 2000 where Mitchell came into her room at 3:00 a.m. and began touching her. (*Id.* at 52-53, 78-79). According to C.O., Mitchell then grabbed her hand and tried to make her touch his penis. (*Id.* at 53). C.O. indicated that she recoiled her hand and pretended that she was asleep; however, her hand still made contact with Mitchell's penis. (*Id.*)

On cross-examination, C.O. stated that in 1998, she accused Mitchell of sexually abusing her. (*Id.* at 57). At the time of her accusation, C.O. and her family were living in a shelter in Ohio without Mitchell. (*Id.* at 58, 92). C.O. told someone at the shelter that Mitchell had touched her vagina. (*Id.* at 58, 92-93). However, when Helen Jordan, a West Virginia Department of Health and Human Services employee, interviewed C.O., C.O. asserted that she lied about Mitchell sexually abusing her. (*Id.* at 59). During that interview, C.O. informed Ms. Jordan that Mitchell had never inappropriately touched her. (*Id.*)

With respect to the March 2000 incident, C.O. clarified that she began drinking that morning and that she continuously drank alcohol for four or five hours that day. (*Id.* at 61-62). At the time of the incident, C.O. weighed approximately 100 pounds. (*Id.* at 61). She testified that she could not recall exactly how much she drank that day; however, she did not vomit or pass out during the four-to-five-hour period that she was drinking. (*Id.*

at 63-64). As for Mitchell's actions that day, C.O. acknowledged that she did not yell for V.O. to help her while Mitchell was sexually abusing her. (*Id.* at 70).

C.O. conceded that she did not tell anyone immediately after either of the sexual abuse incidents occurred. (*Id.* at 71). C.O. also acknowledged that she denied Mitchell ever touching her in a "bad" manner or sexually abusing her at both of the April 2001 interviews with Ms. Perez and Officer Kenny. (*Id.* at 73, 75, 77, 80-82). In addition, C.O. denied Mitchell entering her room at night during those interviews. (*Id.* at 78-79, 82). C.O. also admitted that she did not tell Ms. Perez and Officer Kenny about the lighter fluid incident at the first interview or drinking alcohol with Mitchell at the second interview. (*Id.* at 79, 84).

Regarding the third interview, which occurred in May 2001, C.O. conceded that she informed Ms. Perez that she screamed at Mitchell when he attempted to penetrate her with his penis in March 2000. (*Id.* at 86, 97). C.O. agreed that her statement during the third interview regarding her yelling at Mitchell was not the truth. (*Id.* at 86). In addition, C.O. acknowledged that she did not tell Ms. Perez about the June 2000 incident, when Mitchell made her touch his penis, during the third interview. (*Id.* at 101-02).

The State's final witness was Brian Thompson, the Director of Attendance for Jackson County Schools. (*Id.* at 155). Through Mr. Thompson, the State moved to admit attendance records from March 2000 demonstrating that V.O. and C.O. were both absent from school on March 9, 2000. (*Id.* at 162). Defense counsel objected that the State had failed to disclose the records in a timely fashion, and as such, defense counsel did not have an opportunity to consider whether to move to suppress the documents. (*Id.* at 106-07). The trial court overruled the defense's objection and admitted the records. (*Id.* at 162).

After the State rested, defense counsel moved for a judgment of acquittal on all counts. (*Id.* at 165-66, 174, 183). As pertinent here, defense counsel argued that C.O.'s testimony regarding sexual abuse was inherently incredible and defied "physical laws" given her assertion that, on the day in March 2000 when the abuse occurred, she drank approximately twenty alcoholic drinks in a four-to-five-hour span when she was fourteen years old and weighed ninety-six pounds. (*Id.* at 165-67, 169). The trial court disagreed that C.O.'s testimony was inherently incredible, reasoning that there was no evidence as to how much alcohol was in each drink consumed by C.O. (*Id.* at 168, 173). The trial court also remarked that C.O.'s memory as to how many drinks she consumed was likely impaired by her drinking alcohol and that C.O. remembered having ten dollars, but did not specifically testify that she consumed twenty drinks. (*Id.* at 173-74). With respect to the remaining counts, the trial court ultimately dismissed Count 3 on double jeopardy grounds and Count 14 because there was no evidence that V.O. experienced substantial physical pain when Mitchell struck him twice with a belt. (*Id.* at 149-51, 165, 186-87).

The defense's first witness was Ms. Jordan, the West Virginia Child Protective Services worker who interviewed C.O. in 1998. (*Id.* at 195-98).[4] Ms. Jordan testified that her office received a report from a Child Protective Services office in Ohio indicating that C.O. described being sexually abused by Mitchell. (*Id.* at 195-96). According to Ms. Jordan, C.O. and her family left Ohio before the Ohio office could investigate the allegations. (*Id.* at 196). After receiving the report, Ms. Jordan interviewed C.O. at her middle school. (*Id.* at 198). During the interview, C.O. informed Ms. Jordan that she had lied about Mitchell sexually abusing her. (*Id.* at 199). C.O. explained that she lied because

---

[4] Ms. Jordan's testimony concerning her position and credentials is on page 495 of the trial transcript; however, that page is not contained in the electronic version of the transcript on CM/ECF.

she feared that her family would be ousted from the shelter where they were living since there was a time limit as to how long they could stay there. (*Id.* at 199-200). C.O. relayed that another person at the shelter told her if she accused Mitchell of sexually abusing her, then C.O. and her family could remain at the shelter. (*Id.* at 200). Ms. Jordan testified that she believed C.O. and found that no further investigation was warranted into C.O.'s allegations. (*Id.*) Ms. Jordan also interviewed V.O. at school, who denied any abuse by Mitchell and indicated that he liked Mitchell. (*Id.* at 201-02). On cross-examination, Ms. Jordan stated that, in her twenty-two years of experience as a Child Protective Services worker, she was assigned to cases where a child had recanted allegations of sexual abuse and further investigation demonstrated that the allegations were indeed true. (*Id.* at 204). Ms. Jordan also acknowledged that she worked on cases where there was a delay between the sexual abuse and the victim's reporting of the abuse. (*Id.* at 204-05).

The defense's final two witnesses were Mitchell's parents, Lorena Mitchell and Offie Mitchell. (*Id.* at 206, 217). Both Ms. Mitchell and Mr. Mitchell testified that they had never seen any of the children drinking alcohol or acting drunk. (*Id.* at 213-14, 220-21). Ms. Mitchell stated that C.O. never told her that she was being sexually abused by Mitchell. (*Id.* at 219). Ms. Mitchell also asserted that none of the children informed her that Mitchell was physically abusing them, nor did she observe any signs of abuse. (*Id.* at 210-11).

Prior to closing arguments, the trial court instructed the jury that the arguments of counsel were not evidence and the jury's verdict should not be based on the statements of the attorneys. (*Id.* at 241-42). During the State's closing, the prosecutor asked the jury to look at the case "from the children's viewpoint." (*Id.* at 272). The prosecutor argued that the inconsistencies in the children's testimony actually rendered their statements

more credible because those inconsistences demonstrated that the children had not "rehearsed, planned, [and] fabricated testimony." (*Id.* at 272-73). Similarly, the prosecutor argued that the children's statements were credible because they were honest enough to admit that they had lied in the past. (*Id.* at 275). The prosecutor insisted that there was "no reason" to disbelieve the children's testimony at trial. (*Id.* at 276). With respect to the March 2000 sexual abuse counts, the prosecutor stressed that there was no way to know how much alcohol was in each drink that C.O. consumed; however, the prosecutor insisted that Mitchell must have placed a small amount of alcohol in the drinks so that C.O. would consume more and Mitchell could easily take advantage of her. (*Id.* at 280, 305).

After deliberating for eight and one-half hours, the jury found Mitchell guilty on all counts, with the exception of Count 6 related to the June 2000 sexual abuse incident, on which the jury could not reach an agreement. (*Id.* at 329-35). On January 2, 2003, the trial court entered an order granting, in part, defense counsel's post-trial motion to set aside the convictions. (ECF No. 10-1 at 6; ECF No. 10-2 at 2-3). Specifically, the trial court dismissed Counts 7, 8, 10, 11, 12, and 15, finding that there was no evidence to support those convictions. (ECF No. 10-2 at 2). The trial court denied the defense's motion as to the remaining counts and scheduled Mitchell's sentencing hearing for February 10, 2003. (*Id.* at 2-3). Ultimately, Mitchell was convicted of four counts of sexual abuse by a custodian (Counts 1, 2, 4, and 5), and two counts of child abuse resulting in bodily injury (Counts 9 and 13).

At the February 10, 2003 hearing, Mitchell expressed his desire to fire his defense counsel, and Mr. Cosenza agreed that he could no longer represent Mitchell. (ECF No. 10-9 at 2). Defense counsel noted that a psychiatric evaluation was arranged for Mitchell at

the jail in order to determine Mitchell's suitability for probation; however, Mitchell refused to speak with the doctor scheduled to perform the evaluation. (*Id.* at 2-3). The court relieved Mr. Cosenza from representing Mitchell and appointed Ken Skeen and Ken Skeen, II, to represent Mitchell. (*Id.* at 5, 7).

On February 24, 2003, the trial court held another hearing, at which Mitchell was represented by Mr. Skeen and Mr. Skeen, II. (*Id.* at 10). At the hearing, the trial court indicated that an order was entered in January 2003 appointing a psychiatrist in Charleston to evaluate Mitchell and provide an opinion as to his competency to stand trial. (*Id.* at 11). The trial court noted that the reason for the evaluation listed on the order seemed to be a mistake and that the evaluation was for the purpose of obtaining an opinion as to Mitchell's candidacy for sexual abuse counseling. (*Id.*) However, Mr. Skeen requested that Mitchell be evaluated for competency to stand trial as well, and the trial court granted a continuance for Mitchell to be evaluated. (*Id.* at 13-15).

Mitchell subsequently appeared for sentencing on March 27, 2003. (*Id.* at 19). At that hearing, Mr. Skeen indicated that Mitchell again refused to participate in a scheduled psychiatric evaluation. (*Id.* at 22). Accordingly, the trial court committed Mitchell to the Anthony Correctional Center in Neola, West Virginia, for the purposes of "diagnosis and classification." (*Id.* at 26). The trial court continued Mitchell's sentencing hearing. (*Id.* at 27).

Mitchell's sentencing hearing was held on September 8, 2003. (ECF No. 10-3 at 3). Mitchell maintained that he was innocent and that he would never harm the children. (*Id.* at 8-9). On Counts 1, 2, 4, and 5, the trial court sentenced Mitchell to an indeterminate period of ten to twenty years' imprisonment on each count, with Counts 1 and 2 to run consecutively, and Counts 4 and 5 to run concurrently with Counts 1 and 2. (*Id.* at 15). On

Counts 9 and 13, the court sentenced Mitchell to one to five years' imprisonment on each count, with those sentences to run concurrently with each other but consecutive to the sentences on Counts 1, 2, 4, and 5.[5] (*Id.* at 15-16).

On January 9, 2004, the trial court held a hearing on a motion to withdraw as counsel by Mr. Skeen and Mr. Skeen, II. (ECF No. 10-7 at 2). Mr. Skeen indicated that the attorney-client relationship was "totally destroyed," and Mr. Skeen, II, relayed that Mitchell had accused his attorneys of becoming "conspirators in railroading him though the system and into prison." (*Id.* at 2, 6). According to Mr. Skeen, Mitchell demanded that his counsel raise an argument concerning a conspiracy against him on direct appeal, which counsel refused to do. (*Id.* at 6-7). Mitchell insisted that the trial court, the prosecutor, Mr. Cosenza, law enforcement personnel, and employees of the West Virginia Department of Health and Human Resources conspired to convict and imprison him; however, Mr. Skeen informed the trial court that there was "no basis" for Mitchell's belief. (*Id.* at 7, 9). Mr. Skeen, II, explained that Mitchell accused him of playing a role in the

---

[5] At sentencing, the trial court and the prosecutor both mistakenly stated that Mitchell was convicted of two counts of child abuse creating a substantial risk of serious bodily injury, in violation of West Virginia Code § 61-8D-3(c). (ECF No. 10-3 at 16). In fact, all of the charges under that statute were dismissed by the trial court after the trial. (ECF No. 10-2 at 2). Instead, Mitchell was convicted of two counts of *child abuse resulting in bodily injury*, contrary to West Virginia Code § 61-8D-3(a), in Counts 9 and 13. The potential sentence of imprisonment for both crimes was identical at the time of the offenses and sentencing (and currently), that being one to five years' imprisonment. *See* W. Va. Code § 61-8D-3 (1999). However, under section 61-8D-3(a), the trial court possessed the discretion to sentence a defendant to less than one year in jail, whereas the trial court lacked such discretion under section 61-8D-3(c). Moreover, the potential fine was more severe for the crime of child abuse creating a substantial risk of serious bodily injury. The trial court apparently imposed a fine consistent with that offense, which was $1000 more than the maximum total fine that could have been imposed on both counts of child abuse resulting in bodily injury. (ECF No. 10-3 at 15). At Mitchell's resentencing on April 8, 2004, the trial court seemingly corrected its previous mistake by acknowledging that Mitchell was convicted of two counts of child abuse resulting in bodily injury. (ECF No. 10-4 at 6). Yet, the trial court again assessed a fine that was inconsistent with West Virginia Code § 61-8D-3(a). More importantly, Mitchell's sentence of imprisonment may have been affected if the trial court failed to recognize its discretion to sentence Mitchell to less than one year in jail under section 61-8D-3(a). Mitchell has not raised this specific issue in the instant § 2254 petition; therefore, the issue is not before this Court. Nevertheless, a West Virginia trial court may correct an illegal sentence at any time, pursuant to West Virginia Rule of Criminal Procedure 35(a).

conspiracy before the sentencing hearing. (*Id.* at 8). Mr. Skeen, II, also remarked that Mitchell claimed hearings in his case were held without his presence, even though transcripts from the hearings demonstrated his presence, and Mr. Cosenza, the prosecutor, and the trial court conspired to introduce evidence against him at trial, such as the children's school attendance records. (*Id.* at 10-11).

The trial court also offered Mitchell an opportunity to explain why he desired the appointment of different counsel. Mitchell used the opportunity to elaborate on his conspiracy theory. He indicated that the prosecutor failed to provide him with grand jury transcripts until ten months after his trial, contrary to the trial court's order, and that the grand jury transcripts demonstrated that the prosecutor lied to the grand jury. (*Id.* at 16). Mitchell went on to point out inconsistences between Ms. Perez's grand jury testimony and the statements provided by the children during their interviews with Ms. Perez. (*Id.* at 22-23).

After hearing Mitchell explicate the conspiracy and Mr. Cosenza's purported ineffectiveness at trial, the trial court denied the motion to withdraw. (*Id.* at 30). The court found that there was no evidence of a conspiracy against Mitchell, and consequently, there was no basis to believe that Mr. Skeen and Mr. Skeen, II, were a part of any conspiracy. (*Id.* at 29). The court reasoned that appointing a different attorney would present the same problem because the newly appointed attorney would similarly refuse to raise a conspiracy claim on appeal.[6] In addition, the court found that Mitchell failed to "work with his own counsel in good faith." (*Id.* at 30). The court asserted it was "satisfied" that Mitchell was competent, and if Mitchell did not wish for his counsel to file a direct appeal,

---

[6] A portion of the trial court's reasoning is contained on page 30 of the hearing transcript; however, that page is not contained in the electronic version of the transcript on CM/ECF.

then he had the right to refuse. (*Id.*)

On April 8, 2004, the trial court held a resentencing hearing for the purpose of allowing Mitchell additional time to file his direct appeal. (ECF No. 10-4 at 3, 7). At that hearing, Mitchell insisted that had he received the grand jury transcript before his trial, then "there would have been no trial." (*Id.* at 5). The trial court imposed the same sentence as that given on September 8, 2003. (*Id.* at 5-6). The trial court also granted a motion for change of attorney and appointed the appellate section of the West Virginia Public Defender Services to replace Mr. Skeen and Mr. Skeen, II. (*Id.* at 7-8). In addition, Mitchell requested a change of venue because he was "trying to base [his] appeal on a conspiracy" in the trial court. (*Id.* at 9). The trial court informed Mitchell that venue would change "automatically" on direct appeal. (*Id.*)

In June 2005, Mitchell appealed his convictions to the Supreme Court of Appeals of West Virginia ("WVSCA"). (ECF No. 10-5 at 2-24); *Mitchell v. Pszczolkowski*, No. 2:14-cv-12761, Dkt. No. 15-1 at 44 (June 10, 2014). Mitchell raised two issues on direct appeal: (1) he was incompetent to stand trial, and (2) the trial court erred when it denied his motion to dismiss the sexual abuse charges because C.O.'s testimony was uncorroborated and inherently incredible. (ECF No. 10-5 at 11). In support of his first ground, Mitchell relied on a June 12, 2003 presentence evaluation report from the diagnostic unit at Anthony Correctional Center. (*Id.* at 14). According to Mitchell, the report indicated that he was "likely learning disabled in reading and written expression." (*Id.*) In addition, the report stated that his Minnesota Multiphasic Personality Inventory, Second Edition, ("MMPI-II") results were consistent with an individual who makes unrealistic demands, is suspicious of others, distrusts others, and is hostile to authority. (*Id.*) Mitchell also asserted that the report "suggested the possibility that [he] had frontal lobe damage." (*Id.*)

Furthermore, Mitchell argued that, at a separate "attempted evaluation" in January 2004, he was found to be "ruminative" and "rambling" with "paranoid features," but he did not exhibit symptoms of "overt psychosis." (*Id.*) Notwithstanding, Mitchell noted that the evaluators determined "paranoia could impair his judgment and ability to rationally make decisions regarding his legal case[]." (*Id.* at 14-15). Mitchell insisted that it was "highly unlikely that [he] became learning disabled and paranoid [only] following his trial." (*Id.* at 15). The WVSCA refused Mitchell's petition for appeal in October 2005. *Mitchell*, No. 2:14-cv-12761, Dkt. No. 15-1 at 44.

**B. State Habeas Proceedings**

In January 2006, Mitchell filed his first state habeas petition in the Circuit Court of Jackson County. *Id.* at 46. The circuit court dismissed the petition because "it was apparent that [Mitchell] did not wish to address any constitutional issue regarding his incarceration, but rather requested that he be granted the right to present a case to the Jackson County Grand Jury." (ECF No. 10-1 at 2).

Mitchell filed his second state habeas petition in July 2011. *Mitchell*, No. 2:14-cv-12761, Dkt. No. 15-2 at 2. Mitchell amended his second state habeas petition in April 2013, raising the following issues:

1. Ineffective Assistance of Counsel

   A. Trial counsel failed to point out the continuous alcohol inflamed fighting between Mitchell and the mother of the children as a motive for the children to fabricate their testimony;

   B. Trial counsel failed to challenge the sufficiency of the indictment when provided with an opportunity to;

   C. Trial counsel failed to obtain the discovery needed to prepare an effective defense;

D.  Trial counsel failed to move to quash the indictment and examine the grand jury proceedings;

E.  Trial counsel failed to move the trial court to have the State's witnesses psychologically examined for signs of coaching and the effects of improper interviewing techniques;

F.  Trial counsel failed to object and report the trial judge for aiding the prosecution;

G.  Trial counsel failed to impeach the State's witness, Ms. Perez;

H.  Trial counsel failed to call any expert witnesses;

I.  Trial counsel allowed the prosecution to deny Mitchell his Sixth Amendment right to confrontation when the investigating officer and C.P.S. worker were not called to testify at trial;

J.  Trial counsel failed to raise the issue of Mitchell's competency to stand trial and assist in his own defense prior to the trial;

K.  The police and C.P.S. used improper interview techniques to obtain the statements of the child witnesses; and

L.  Trial counsel failed to object to the trial court only dismissing Counts 7, 8, 10, 11, and 15.

2.  Prosecutorial Misconduct

A.  The prosecutor knowingly permitted and encouraged the C.P.S. investigator to present false and misleading evidence to the grand jury;

B.  The prosecutor knowingly lied to defense counsel in her October 21, 2002 letter when she stated that the discovery in the instant case was identical to the discovery in the dismissed 2001 case;

C.  The prosecutor subjected Mitchell to an indictment that fails to bar the raising of double jeopardy and multiple punishments;

D.  The prosecutor again knowingly withheld discovery material;

E.  The prosecutor denied Mitchell his right to confront the two investigating officers at trial; and

F.  The prosecutor made improper remarks during closing argument that denied Mitchell a fair trial.

3. Judicial Misconduct

    A. The trial judge many times showed deference strongly favoring the prosecution and aided the prosecution in its cause before and during the trial, which denied Mitchell a fair and just trier of fact, and a fair trial; and

    B. The trial judge erred and showed bias favoring the prosecution when he denied defense counsel's motion for a continuance.

4. Cumulative Error

*Id.* at 93-167; (ECF No. 10-1 at 9-22). Mitchell attached forty-one exhibits to the petition. *Mitchell*, No. 2:14-cv-12761, Dkt. No. 15-2 at 95-96.

On July 24, 2014, the state circuit court entered an order denying Mitchell's state habeas petition without holding an evidentiary hearing.[7] (ECF No. 10-1 at 2-4). The circuit court noted that Mitchell had been appointed counsel on nine separate instances during his habeas proceedings; however, Mitchell failed to cooperate with his attorneys and insisted that they argue Mitchell was the victim of a criminal conspiracy resulting in his conviction and imprisonment. (*Id.* at 3). The circuit court found that an evidentiary hearing was unnecessary because the only evidence that Mitchell wished to present at the hearing concerned his allegations of a conspiracy between the trial court, the prosecutor, and Mr. Cosenza. (*Id.* at 3-4).

As to the substance of Mitchell's claims, the circuit court generally concluded that Mitchell received effective representation at trial and that, even if trial counsel's performance were deficient, Mitchell had failed to demonstrate prejudice. (*Id.* at 15-16). With respect to Mitchell's specific claims of ineffective assistance of counsel, the circuit court found that counsel acted reasonably in refraining from arguing Mitchell's proposed

---

[7] Because Mitchell alleged that the trial court committed judicial misconduct, Mitchell's state habeas case was assigned to a different circuit court judge. *Rodger M. v. Ballard*, No. 14-0820, 2015 WL 3952698, at *1 (W. Va. June 26, 2015).

theory as to why the children would fabricate their testimony, particularly when the theory was detrimental to Mitchell's character. (*Id.* at 9). The circuit court noted "it would be a curious defense strategy for counsel to inform the jury that [Mitchell] regularly became intoxicated and beat the victims' mother." (*Id.*) The court characterized Mitchell's second and fourth ineffective assistance claims as an argument that defense counsel conspired with the prosecutor by not moving to dismiss Count 6 of the indictment. (*Id.* at 9). Because the trial court declared a mistrial as to Count 6, the court reasoned that Mitchell could not demonstrate prejudice. (*Id.* at 10-11). Regarding defense counsel's purported failure to obtain necessary discovery, the circuit court emphasized defense counsel's decision to refrain from requesting discovery because the evidence in the instant case and the 2001 case was the same, and defense counsel would not have to provide the State with reciprocal discovery if he opted not to request discovery. (*Id.* at 11-12). The court also determined that Mitchell had failed to demonstrate that any additional discovery existed. (*Id.* at 12). On the subject of defense counsel's alleged failure to object to the trial court's aiding of the prosecution, the circuit court concluded that an objection would have been meritless and therefore, defense counsel's performance was not deficient. (*Id.* at 13-14). As for Mitchell's claim that defense counsel failed to raise the issue of Mitchell's competency to stand trial, the court noted that Mitchell was twice scheduled for a psychiatric evaluation, but he failed to cooperate. (*Id.* at 14-15). As such, the court found that "[i]t is unconscionable that [Mitchell] would ... be able to benefit from his lack of cooperation by claiming that such failure to cooperate ... constitutes ineffective assistance of counsel." (*Id.* at 15). With respect to Mitchell's argument that his trial counsel failed to object to the trial court's dismissal of only Counts 7, 8, 10, 11, and 15, the circuit court found that Mitchell's assertion was incorrect and that defense counsel

moved for the dismissal of all counts after trial. (*Id.*) Lastly, the circuit court concluded that the remaining ineffective assistance of counsel claims did "not allege any violation of a constitutional right," and thus, the claims were "not a basis for review in a habeas corpus proceeding." (*Id.* at 14-15).

The circuit court similarly found that Mitchell's prosecutorial misconduct claims were without merit. (*Id.* at 17-18). As to Mitchell's claim that the prosecutor knowingly permitted and encouraged Ms. Perez to present false and misleading testimony to the grand jury, the court found that there was no prosecutorial misconduct. (*Id.* at 17). Regarding Mitchell's claim that the prosecutor knowingly lied about discovery material or withheld discovery material, the circuit court noted that the prosecutor was not required to provide defense counsel with discovery, other than exculpatory evidence, and that Mitchell had failed to identify any discovery that the prosecutor had neglected to produce to defense counsel. (*Id.* at 17-18). With respect to Mitchell's argument that the prosecutor subjected Mitchell to an indictment that failed "to bar the raising of double jeopardy and multiple punishments," the circuit court found that the claim was partially moot based on the dismissal of certain counts and lacked merit as to the remaining counts. (*Id.* at 17). In addressing Mitchell's assertion that the prosecutor denied Mitchell his right to confrontation, the circuit court pointed out that the prosecutor retained discretion to refrain from calling certain witnesses and that defense counsel could have called Ms. Perez or Officer Kenny. (*Id.* at 18). Finally, after reviewing the prosecutor's closing argument, the circuit court concluded that the prosecutor's comments did "not rise to the level of clear prejudice and did not result in manifest injustice." (*Id.*) (markings omitted).

The circuit court also rejected Mitchell's claims of judicial misconduct. As to Mitchell's first contention that the trial court favored the prosecution prior to and during trial, the court found that "[t]he record in the ... case reveal[ed] that the trial judge committed no acts during the course of the trial that prejudiced [Mitchell's] right to an impartial and neutral judge during trial." (*Id.* at 19-20). With regard to Mitchell's claim that the trial court erred in denying the defense's motion for a continuance to investigate the State's 404(b) motion, the circuit court noted that the trial court recessed the trial and permitted the defense time to prepare a response. (*Id.* at 20-21). The circuit court pointed out that, after the recess, defense counsel was permitted to call a witness to provide testimony in response to the State's motion. (*Id.* at 21). After hearing from the witness, the trial court permitted the parties to offer arguments on the State's motion and ruled that the evidence was admissible. (*Id.*) Ultimately, the circuit court concluded that the "trial court showed no bias and in fact granted [Mitchell's] motion to continue trial and sent the jury home for the day so that [Mitchell] could respond to the State's motion ...." (*Id.* at 22).

Mitchell subsequently appealed the circuit court's denial of state habeas relief. *Rodger M. v. Ballard*, No. 14-0820, 2015 WL 3952698, at *1 (W. Va. June 26, 2015). On appeal, Mitchell argued that the circuit court failed to address all of the issues raised in his petition and that the circuit court erred in not appointing him counsel. *Id.* at *2. On June 26, 2015, the WVSCA issued a memorandum decision affirming the circuit court's denial of state habeas relief. *Id.* at *1. The WVSCA concluded that the circuit court's order denying relief sufficiently addressed Mitchell's grounds for relief and that the circuit court was not required to address Mitchell's cumulative error argument because the individual allegations of error were meritless. *Id.* at *2. Additionally, the WVSCA determined that

the circuit court properly explained that Mitchell was required to proceed *pro se* in his state habeas proceeding because he refused to cooperate with appointed counsel. *Id.* Furthermore, the WVSCA found that the circuit court adequately explained why an evidentiary hearing on the petition was unnecessary. *Id.* The WVSCA adopted and incorporated the circuit court's "well-reasoned findings and conclusions." *Id.*

### C.  Federal Habeas Proceedings

Before filing the instant petition, Mitchell previously filed two § 2254 petitions. Mitchell's first § 2254 petition was dismissed without prejudice because he failed to exhaust his state court remedies. *Mitchell v. Ballard*, No. 2:12-cv-2149, 2012 WL 4356273, at *1 (S.D.W.Va. Sept. 24, 2012). Mitchell's second § 2254 petition was dismissed for the same reason. *Mitchell v. Pszczolkowski*, No. 2:14-cv-12761, 2014 WL 7399086, at *1 (S.D.W.Va. Dec. 29, 2014).

Mitchell filed the instant § 2254 petition on August 13, 2015. (ECF No. 2). Therein, Mitchell asserts the following grounds for relief:

1.  Ineffective Assistance of Counsel

    A.  Trial counsel failed to point out the continuous alcohol inflamed fighting between Mitchell and the mother of the children as a motive for the children to fabricate their testimony;

    B.  Trial counsel failed to challenge the sufficiency of the indictment when provided with an opportunity to;

    C.  Trial counsel failed to obtain the discovery needed to prepare an effective defense;

    D.  Trial counsel failed to move to quash the indictment and examine the grand jury proceedings;

    E.  Trial counsel failed to move the trial court to have the State's witnesses psychologically examined for signs of coaching and the effects of improper interviewing techniques;

F.  Trial counsel failed to object to and report the trial judge for aiding the prosecution;

G.  Trial counsel failed to motion the court to impeach the State's witness, Ms. Perez, for false swearing and perjury;

H.  Trial counsel failed to call any expert witnesses;

I.  Trial counsel denied, and allowed the prosecution to deny, Mitchell his Sixth Amendment right to confrontation when the investigating officer and C.P.S. worker were not called to testify at trial;

J.  Trial counsel failed to raise the issue of Mitchell's competency to stand trial and assist in his own defense prior to the trial;

K.  Trial counsel was ineffective when he allowed the police and C.P.S. to use improper interview techniques to obtain the statements of the child witnesses; and

L.  Trial counsel failed to object to the trial court only dismissing Counts 7, 8, 10, 11, 12, and 15.

2.  Prosecutorial Misconduct

A.  The prosecutor knowingly violated Mitchell's right to due process of law when she permitted and encouraged the C.P.S. investigator to present false and misleading evidence to the grand jury;

B.  The prosecutor knowingly violated Mitchell's right to due process of law when she lied to defense counsel in her October 21, 2002 letter wherein she stated that the discovery in the instant case was identical to the discovery in the dismissed 2001 case;

C.  The prosecutor subjected Mitchell to an indictment that fails to bar the raising of double jeopardy and multiple punishments;

D.  The prosecutor again knowingly withheld discovery material that she knew to hold proof of foul play by the prosecutor and Ms. Perez;

E.  The prosecutor denied Mitchell his right to confront the two investigating officers at trial; and

F.  The prosecutor violated Mitchell's right to due process when she made improper remarks during closing argument that denied Mitchell a fair trial.

3. Judicial Misconduct

    A.  The trial judge many times showed deference strongly favoring the prosecution and aided the prosecution in its cause before and during the trial, which denied Mitchell a fair and just trier of fact, and a fair trial; and

    B.  The trial judge erred and showed bias favoring the prosecution when he refused to rule on defense counsel's motion for a continuance at the time it was made rather than during the trial.

(ECF No. 2 at 6-10, 13-15, 17).

On September 25, 2015, the undersigned ordered Respondent to answer the petition. (ECF No. 8). On December 2, 2015, Respondent filed an Answer, (ECF No. 9), and a Motion for Summary Judgment with an accompanying memorandum of law, (ECF Nos. 10 & 11). In Respondent's Answer, she asserts that Mitchell has seemingly exhausted his state court remedies for the claims contained in his § 2254 petition. (ECF No. 9 at 2). In her memorandum, Respondent contends that Mitchell is not entitled to habeas relief. (ECF No. 11 at 2). With respect to Mitchell's ineffective assistance of counsel claims, Respondent argues that seven of the claims (A, B, D, E, G, H, and I) are strategic decisions that are "insulated from ineffective assistance review." (*Id.* at 12-18). Separately, Respondent avers that four of the claims (C, F, L, and K) involve conduct by trial counsel that was reasonable. (*Id.* at 18-20). As for Mitchell's claim that trial counsel was ineffective for failing to raise the issue of Mitchell's competency, Respondent asserts that there is no evidence that Mitchell was not competent to stand trial. (*Id.* at 20). Although Respondent acknowledges that Mitchell's claim of a conspiracy against him is "nigh-delusional," which "might suggest that [Mitchell's] grip on reality is less than firm," Respondent nevertheless insists that nothing in the record indicates that Mitchell "was unable to satisfy the minimum requirements to be considered competent at the time he

was tried." (*Id.* at 21). To the contrary, Respondent asserts that Mitchell understood the nature of the proceedings against him and was able to consult with his counsel concerning his criminal case. (*Id.*)

Respondent also maintains that Mitchell's claims of prosecutorial misconduct are unfounded. Specifically, Respondent denies that the prosecutor knowingly presented false evidence to the grand jury through the testimony of Ms. Perez and insists that Ms. Perez's testimony is corroborated by the children's testimony at trial. (*Id.* at 24). Moreover, because Mitchell was ultimately convicted by a petit jury, Respondent argues that any inconsistencies between Ms. Perez's testimony and the children's testimony at trial are harmless beyond a reasonable doubt. (*Id.*) Regarding Mitchell's contention that the prosecutor withheld discovery material, Respondent insists that Mitchell has failed to offer any factual support for his claim. (*Id.* at 24-25). Finally, Respondent asserts that any improper remarks by the prosecutor did not render Mitchell's trial fundamentally unfair. (*Id.* at 25). While Respondent concedes that the prosecutor's invitation for the jury to look at the case "from the children's viewpoint" was improper, she professes that the prosecutor's comment was isolated and not "powerful enough to supplant the evidence" presented at trial. (*Id.* at 27).

On the subject of Mitchell's judicial misconduct claims, Respondent contends that Mitchell has presented no evidence that the trial court was biased against him. (*Id.* at 30). Quite the opposite, Respondent notes that the trial court dismissed the indictment in the 2001 case and dismissed a number of charges throughout the trial and after trial. (*Id.*) Furthermore, Respondent argues that the trial court possessed great latitude in deciding whether to grant a continuance to the defense, and in any event, "the failure to grant a continuance is not a valid basis for a claim of judicial misconduct." (*Id.*)

On April 28, 2016, Mitchell filed a Memorandum of Law in Opposition to Respondent's Motion for Summary Judgment. (ECF No. 26). Therein, Mitchell elaborates on his grounds for relief and responds to Respondent's arguments for summary judgment. Mitchell's arguments are addressed in detail below. Attached to his memorandum are a number of exhibits, including an affidavit by Mitchell dated April 26, 2016, wherein Mitchell states that he was "laboring under severe paranoia" when he refused to cooperate with the scheduled psychological evaluations post trial. (ECF No. 26-1 at 1). Mitchell also asserts that he was subsequently tested at the Anthony Correctional Center in June 2003 and at a "testing facility in Charleston, West Virginia." (*Id.* at 2). According to Mitchell, the results of the testing revealed that he was not mentally stable. (*Id.*) In addition, Mitchell reports that he attempted to commit suicide twice while awaiting trial in 2001 and that he was hospitalized at Sharpe's Hospital in Weston, West Virginia as a consequence of those attempts. (*Id.*)

On May 3, 2016, Mitchell filed another Memorandum of Law in Opposition to Respondent's Motion for Summary Judgment, again explicating his claims for relief. (ECF No. 28). Mitchell subsequently filed a Motion to Allow Incorporation of Exhibit Q into Grounds E and H, Exhibits R and U into Ground 2D and Correction of Page 20, in which he requests that specific exhibits be considered by the court when analyzing certain claims. (ECF No. 29). In addition, Mitchell filed a Motion for Ruling of Default, (ECF No. 30); however, he later filed a letter-form motion to withdraw his Motion for a Ruling of Default. (ECF No. 31). Mitchell has also filed a Motion to Allow Incorporation of Vital and Necessary Information the Court Needs to Consider, (ECF No. 33).

## II.   <u>Standard of Review</u>

Title 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214, authorizes a federal district court to entertain a petition for habeas corpus relief from a prisoner in state custody, "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When determining the merits of a § 2254 petition, the district court applies the standard set forth in § 2254(d), which provides that the habeas petition of a person in State custody "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim" is:

(1) contrary to, or involves an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d) (1) and (2). Moreover, the factual determinations made by the state court are presumed to be correct and are only rebutted upon presentation of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). Thus, when reviewing a petition for habeas relief, the federal court uses a "highly deferential lens." *DeCastro v. Branker,* 642 F.3d 442, 449 (4th Cir. 2011).

A claim is generally considered to have been "adjudicated on the merits" when it is "substantively reviewed and finally determined as evidenced by the state court's issuance of a formal judgment or decree." *Thomas v. Davis*, 192 F.3d 445, 455 (4th Cir. 1999). The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and independent meanings. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146

L.Ed.2d 389 (2000). A state court decision warrants habeas relief under the "contrary to" clause "if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to the Supreme Court's." *Lewis v. Wheeler*, 609 F.3d 291, 300 (4th Cir. 2010) (quoting *Williams,* 529 U.S. at 405) (internal quotations omitted). A habeas writ may be granted under the "unreasonable application" clause if the state court "identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular case." *Id.* at 300-01 (internal marks omitted).

Accordingly, the AEDPA limits the habeas court's scope of review to the reasonableness, rather than the correctness, of the state court's decision. A federal court may not issue a writ under this standard "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather the application must also be unreasonable." *Williams*, 529 U.S. at 365.

Here, Respondent has moved for summary judgment. (ECF No. 10). Summary judgment under Rule 56 of the Federal Rules of Civil Procedure "applies to habeas proceedings." *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991)). Summary judgment will be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact or facts are material if they constitute a legal defense, or if their existence or nonexistence might affect the result of the action, or if the resolution of the issue they raise is so essential that the party against whom it is decided cannot prevail." Charles Alan Wright, Arthur R. Miller &, Mary

Kay Kane, *Federal Practice and Procedure*: *Civil* § 2725 (3d ed. 2005). On the other hand, a fact is not material when it is of no consequence to the outcome, or is irrelevant in light of the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Assertions of material facts must be supported by "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). In addition, only genuine disputes over material facts "will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A dispute is "genuine" when "there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

Motions for summary judgment impose a heavy burden on the moving party as it must be obvious that no material facts are in dispute and no rational trier of fact could find for the nonmoving party. *See Miller v. F.D.I.C.*, 906 F.2d 972, 974 (4th Cir. 1990). Nonetheless, the "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent entry of summary judgment. *Anderson,* 477 U.S. at 252. While any permissible inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Anderson*, 477 U.S. at 249-50).

### III.   Discussion

### A. Ineffective Assistance of Counsel

In his first ground for relief, Mitchell argues that his trial counsel was ineffective for numerous reasons. The Sixth Amendment to the United States Constitution guarantees a criminal defendant "the right to the effective assistance of counsel." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While "assistance which is ineffective in preserving fairness does not meet the constitutional mandate ... defects in assistance that have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2001). To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687-88, 694. When reviewing counsel's performance, the "court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. Moreover, counsel's performance should be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," and a court should not allow hindsight to alter its review. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In addition, trial strategy devised after investigating the law and facts is "virtually unchallengeable." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995).

In a § 2254 proceeding, the standard of review differs somewhat from the standard used in the direct review of a *Strickland*-based challenge where the state court adjudicated the petitioner's ineffective assistance of counsel claims on the merits.

*Harrington v. Richter*, 562 U.S. 86, 101, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). "The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem review is doubly so." *Id.* at 105 (internal citations and quotations omitted). "'Surmounting *Strickland's* high bar is never an easy task[;]' ... Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id.* (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010)). When a state court has adjudicated an ineffective assistance of counsel claim on the merits in summary fashion, the issue is "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Before proceeding to the merits of Mitchell's ineffective assistance of counsel claims, one error in the state courts' habeas decisions should be addressed. The state courts found that certain ineffective assistance of counsel claims (E, G, H, I, and K), presented by Mitchell did not state a constitutional claim, and thus, those claims were not cognizable in a state habeas proceeding. Therefore, the state courts dismissed the claims on a procedural ground, rather than addressing the merits of the claims. *See Smith v. Mirandy*, No. 2:14-cv-18928, 2016 WL 1274592, at *17 (S.D.W.Va. Mar. 31, 2016) (recognizing that state court rejected claim on procedural ground where state court found claim was not cognizable in state habeas proceeding); *Evans v. Thaler*, No. 10-CA-220-XR, 2011 WL 6153422, at *9 (W.D. Tex. Dec. 9, 2011) ("Where a state habeas court finds a claim not to be cognizable, it is a finding that the claim is procedurally defaulted."); *Wheeler v. Vaughn*, No. Civ.A. 01-428, 2004 WL 73728, at *8 (E.D. Pa. Jan. 6, 2004) (finding that procedural default doctrine applied to state court's determination that claim was not cognizable is state habeas proceeding). *But see Hardin v. Black*, 845 F.2d 953, 959 (11th Cir. 1988) ("We cannot accept the state's proposition that a determination of

whether a particular claim is of constitutional dimension is equivalent to a state court's invocation of and reliance upon its procedural default rules.").

The state courts unquestionably erred in their procedural ruling. The courts seemingly believed that an ineffective assistance of counsel claim must be accompanied by a separate, underlying constitutional challenge for the ineffective assistance claim to be cognizable. However, that belief is incorrect. The constitutional issue raised by an ineffective assistance of counsel claim is just that—the lack of effective assistance itself under the Sixth Amendment to the United States Constitution. In other words, a separate constitutional challenge need not be paired with or underlie the claim of ineffective assistance. *See Losh v. McKenzie*, 277 S.E.2d 606, 611 (W. Va. 1981) (recognizing that ineffective assistance of counsel is separate claim cognizable in state habeas). Rather, to sufficiently raise an ineffective assistance of counsel claim, a petitioner need only allege that (1) counsel's performance was objectively unreasonable for a specific reason, like the failure to consult with or call at trial an expert witness, even where the petitioner possessed no constitutional right to have an expert appointed or have an expert testify regarding a particular field at trial, and (2) the deficient performance caused prejudice to the petitioner. The realm of potential claims that may be raised under a Sixth Amendment ineffective assistance of counsel umbrella expands beyond a list of other potential constitutional challenges. Moreover, the state courts' rulings on this issue are even more problematic when one considers that claims of ineffective assistance of counsel will generally not be entertained on direct appeal to the WVSCA. *See, e.g.*, *State v. Miller*, 459 S.E.2d 114, 126 (W. Va. 1995). As such, under the state courts' reasoning here, ineffective assistance of counsel claims that do not incorporate a separate constitutional issue could never be raised, since those claims would not be addressed on direct appeal and would

not be cognizable in a state habeas proceeding.

Recognizing that the state courts' rulings on these particular ineffective assistance claims were of a procedural nature, the undersigned next considers whether the procedural default doctrine bars review of the merits of the claims. The procedural default doctrine prevents a court from hearing a claim that has been disposed of on "adequate and independent state-law grounds, unless the petitioner can show cause and prejudice for, or a fundamental miscarriage of justice resulting from, failure to comply with the applicable rule." *See Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). Although the Fourth Circuit has indicated that "a federal court does not have license to question a state court's finding of procedural default,"[8] the adequacy of a state's procedural bar is a federal question on which the state court does not have the final say. *Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995); *see also Cone v. Bell*, 556 U.S. 449, 465, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009); *Sharpe v. Bell*, 593 F.3d 372, 377 (4th Cir. 2010). "A rule is adequate if it is regularly or consistently applied by the state court." *Hedrick v. True*, 443 F.3d 342, 359 (4th Cir. 2006) (internal citations and markings omitted) (ellipsis in original); *see also Johnson v. Lee*, 578 U.S. ____, 136 S.Ct. 1802, 1804, ____ L.Ed.2d ____ (2016) ("State rules count as adequate if they are firmly established and regularly followed.") (citation and markings omitted). However, "the fact that a state procedural rule is adequate in general does not answer the question of whether the rule is adequate as applied in a particular case." *Reid v. True*, 349 F.3d 788, 805 (4th Cir. 2003).

---

[8] *But see Jalowiec v. Bradshaw*, 657 F.3d 293, 303 (6th Cir. 2011) (holding erroneous application of procedural bar presented "no obstacle" to federal court review); *Brown v. Sec'y for Dep't of Corr.*, 200 F. App'x 885, 887 (11th Cir. 2006) (declining to apply procedural default doctrine where state court's procedural ruling was "based on an incorrect application of state procedural default law"); *Brownstein v. Dir., Ill. Dep't of Corr.*, 760 F.2d 836, 840 (7th Cir. 1985) ("[F]ederal courts can look beyond state court determinations of default.").

"Answering that question requires [a federal court] to determine whether [the procedural rule] is regularly and consistently applied to claims of the type raised by [the petitioner]." *Id.* at 805; *see also Boothe v. Ballard*, No. 2:14-cv-25165, 2016 WL 1275054, at *47 (S.D.W.Va. Mar. 31, 2016). "The relevant inquiry concerns the procedural posture of the defaulted claim: 'The question [a court] must ask ... is whether the particular procedural bar is applied consistently to cases that are procedurally analogous.'" *Reid*, 349 F.3d at 805 (quoting *McCarver v. Lee*, 221 F.3d 583, 589 (4th Cir. 2000)) (ellipsis in original).

Ultimately, federal courts "have an independent duty to scrutinize the application of state rules that bar ... review of federal claims." *Cone*, 556 U.S. at 468. Here, the state court's procedural rule, that certain ineffective assistance of counsel claims are not cognizable on state habeas review, is not adequate. West Virginia state courts neither regularly nor consistently apply a rule that delineates particular ineffective assistance of counsel claims as cognizable in state habeas proceedings. Stated differently, the procedural bar applied in Mitchell's case is not regularly applied "to claims of the type" raised by Mitchell. *Reid*, 349 F.3d at 805. Because the state court's procedural bar is not adequate as applied to Mitchell's case, none of Mitchell's ineffective assistance of counsel claims are procedurally defaulted.

Turning to the standard of review to be applied to the five ineffective assistance of counsel claims that the state courts rejected on procedural grounds, where a state court does not reach the merits of a federal constitutional claim because the court applied an inadequate state procedural rule, the claim is reviewed *de novo* by a federal court. *Tanner v. McDaniel*, 493 F.3d 1135, 1139 (9th Cir. 2007); *see also Cone*, 556 U.S. at 472 (reviewing federal constitutional claim *de novo* where state court never reached merits of claim and rejected claim on erroneous procedural ground). Accordingly, Mitchell's ineffective

assistance of counsel claims contained in subsections E, G, H, I, and K will be reviewed *de novo*, while the remaining ineffective assistance of counsel claims are entitled to the deferential standard of review set out in the AEDPA. With this understanding, the undersigned turns to the merits of Mitchell's claims.

### 1. Trial Counsel's Failure to Elicit Testimony Regarding a Motive for the Children to Fabricate Their Testimony

Mitchell contends that his trial counsel was ineffective when he failed to elicit testimony that Mitchell and the children's mother engaged in "continuous alcohol inflamed fighting." (ECF No. 2 at 6). He asserts that trial counsel should have argued that the children fabricated their stories of abuse to protect their mother from Mitchell and "to save their mother's life." (*Id.*) Mitchell also argues that defense counsel could have introduced evidence of a restraining order obtained by the children's mother against Mitchell as proof of the children's motive to lie. (ECF No. 28 at 3). Mitchell points out that C.O. informed Ms. Perez and Officer Kenny in April 2001 that she wanted "to get [Mitchell] out of the family" because C.O. believed that Mitchell was "bad for [them]" and drank alcohol "all the time." (ECF No. 26-2 at 5). C.O. also told Ms. Perez and Officer Kenny: "I think that if my mom was told she was going to lose us[,] she would leave [Mitchell]. I know she loves him very much. I know she would leave him." (*Id.* at 7). Mitchell also notes that V.O. and W.O. stated at their April 2001 interviews that they believed they were being interviewed because Mitchell hit their mother. (*Id.* at 21-22). Mitchell insists that defense counsel should have presented this evidence at trial and argued that the children made up their stories of abuse to prevent Mitchell from fighting with and hitting their mother.

The state circuit court found Mitchell's claim unpersuasive. (ECF No. 10-1 at 9). The court indicated that it "would not second guess defense counsel's strategy" to refrain from introducing evidence that Mitchell "regularly drank heavily and physically abused" the children's mother. (*Id.*) The court concluded that "it would be a curious defense strategy for counsel to inform the jury that [Mitchell] regularly became intoxicated and beat the victims' mother." (*Id.*) The WVSCA adopted the circuit court's findings and conclusions on the issue. *Rodger M.*, 2015 WL 3952698, at *1.

In his opening statement, defense counsel indicated that he did not know why the children fabricated their stories of abuse, but "perhaps it's because they wanted to protect their mother," or "[p]erhaps it's because they don't like [Mitchell]." (ECF No. 10-10 at 205). During W.O.'s trial testimony, defense counsel questioned whether W.O. disliked Mitchell, and W.O. responded that he sometimes did not like Mitchell because of how Mitchell treated his mother. Defense counsel then moved on; however, W.O. testified on redirect examination that he observed Mitchell hit the children's mother on two occasions. Defense counsel did not follow up on any motive for fabrication until closing argument. In closing, defense counsel stated:

> You heard the prosecuting attorney tell you, in her closing argument, that it's my belief that [the children's] motivation is because [Mitchell] abused their mother. Well, maybe that is their motivation. Maybe their motivation is something else. They're now living with their father. They're now living with his family. I don't know what the motivation of these children is. I'm not sure we'll ever know the answer to that question. And it's not my job to know that or to prove it, because the burden of proof in this case rests [with the State].

(ECF No. 10-11 at 299).

Once W.O. testified on redirect examination that Mitchell struck the children's mother, defense counsel declined to elicit further information regarding Mitchell's

actions toward the children's mother. This was a reasonable strategy. Given that the charges in the indictment related to the physical abuse of the children, defense counsel could have rationally concluded that introducing evidence that Mitchell physically abused the children's mother would be unwise. Moreover, evidence that Mitchell often drank alcohol would not have helped his cause, especially when one considers the testimony of C.O. and W.O. that Mitchell paid them to drink alcohol with him on the day that Mitchell sexually abused C.O. While Mitchell argues that he was accused of "horrendous" acts, and thus, evidence that Mitchell became inebriated and abused the children's mother was tame compared to the alleged crimes, that is not a sound reason for defense counsel to present evidence maligning Mitchell's character and representing him as a violent alcoholic. Quite simply, defense counsel could have reasonably determined that presenting a theory that (1) the defense was not required to establish a motive for fabrication, and (2) the children's stories were inherently incredible, was significantly better than a defense theory that the children wanted Mitchell out of their home because he physically abused their mother. Furthermore, by the time that the children testified at trial, they were living with their father, and as such, the purported motive for fabrication had dissipated. (ECF No. 10-10 at 212). Ultimately, defense counsel's declination to elicit testimony regarding Mitchell's alcohol abuse and violence was a reasonable trial strategy. *See Reynoso v. Giurbino*, 462 F.3d 1099, 1113 (9th Cir. 2006) ("[M]atters such as counsel's approach to impeachment are often viewed as tactical decisions ....").

Aside from counsel's strategy being an objectively reasonable one, Mitchell has failed to demonstrate that he suffered any prejudice. Indeed, Mitchell is hard-pressed to show that the introduction of additional evidence that Mitchell abused the children's mother would have resulted in a different outcome at trial. In any event, the jury was

aware from W.O.'s testimony that W.O. disliked Mitchell and that Mitchell hit the children's mother on two occasions, yet, the jury still convicted Mitchell.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that ground for relief 1(A) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 2.  *Trial Counsel's Failure to Challenge the Indictment*

In his second and fourth claims of ineffective assistance of counsel, Mitchell argues that his trial counsel was ineffective for failing to challenge the sufficiency of the indictment. (ECF No. 2 at 6-7). Mitchell particularly takes issue with defense counsel's failure to challenge Counts 6 and 15 of the indictment, which he believes were not supported by the children's statements to Ms. Perez and Officer Kenny in April and May 2001. (*Id.*; ECF No. 26 at 28-30; ECF No. 28 at 11-15). The state circuit court described Mitchell's claim as one that "[d]efense counsel was involved in a conspiracy with the Jackson County Prosecuting Attorney because he did not move to dismiss Count Six (6) of the [i]ndictment." (ECF No. 10-1 at 9). The court denied the claim because the trial court dismissed Count Six after the jury could not reach a unanimous decision. (*Id.* at 10-11). The WVSCA agreed with the circuit court. *Rodger M.*, 2015 WL 3952698, at *1.

As the circuit court noted, Count Six was dismissed by the trial court after the jury could not reach a decision on the charge. Therefore, Mitchell cannot demonstrate prejudice for his claim. Likewise, Count 15 was dismissed by the trial court based on trial counsel's post-trial motion to dismiss. Consequently, Mitchell again cannot show prejudice. As such, Mitchell's particular claims regarding defense counsel's failure to

challenge the indictment fail.

For these reasons, the undersigned **FINDS** that the state court's decisions on Mitchell's claims are not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that grounds for relief 1(B) and 1(D) be **DENIED**, and Respondent be **GRANTED** summary judgment on those grounds of Mitchell's § 2254 petition.

### 3. *Trial Counsel's Failure to Obtain the Discovery Needed to Prepare an Effective Defense*

Mitchell also contends that his trial counsel was ineffective for failing to obtain the discovery needed to prepare an effective defense. (ECF No. 2 at 7). Mitchell insists that trial counsel should have obtained the transcript of Ms. Perez's testimony before the grand jury in June 2002. (ECF No. 28 at 24). Mitchell asserts that defense counsel would have observed that Ms. Perez lied before the grand jury, which would have altered the defense strategy at trial. (*Id.*)

The state circuit court rejected this claim and pointed out that defense counsel chose not to request discovery from the State because the discovery in the instant case and the dismissed 2001 case were the same. (ECF No. 10-1 at 11). Moreover, the circuit court noted that defense counsel avoided having to engage in reciprocal discovery by refraining from requesting discovery. (*Id.* at 12). In addition, the court found that Mitchell had failed to identify any additional discovery that the State did not produce to the defense. (*Id.*) The WVSCA adopted the circuit court's findings and conclusions on the issue. *Rodger M.*, 2015 WL 3952698, at *1.

Mitchell's claim fails both prongs of the *Strickland* analysis. Although a seemingly unusual decision, trial counsel employed a reasonable strategy in refraining from

requesting discovery in the unique circumstances of this case. *See United States v. Marenghi*, 893 F. Supp. 85, 98 (D. Me. 1995) (recognizing that decision whether to engage in reciprocal discovery is "part of a defendant's strategy in the preparation of a criminal defense"); *Beck v. State*, 647 S.E.2d 408, 410 (Ga. App. 2007) (holding defense counsel's decision to refrain from requesting discovery under reciprocal discovery act was strategic). Trial counsel declined to request discovery, knowing that the discovery was identical to the dismissed 2001 case and that the defense would not be required to engage in reciprocal discovery if the defense did not request discovery. Moreover, defense counsel was aware that the State would be required to disclose any exculpatory evidence to the defense prior to trial.

Additionally, Mitchell cannot demonstrate prejudice. Other than the 2002 grand jury transcript, Mitchell has not identified any particular discovery that defense counsel failed to obtain. As to the grand jury transcript, it appears that defense counsel did request the transcript. To the extent that Mitchell argues that defense counsel was ineffective for failing to ever obtain the transcript, he again cannot show prejudice. First, Mitchell has not explained why he was entitled to the grand jury transcript under the West Virginia Rules of Criminal Procedure. Second, Ms. Perez did not testify at trial, so the value of her grand jury testimony at trial was minimal. Third, Ms. Perez's grand jury testimony mostly corroborated the testimony of the State's witnesses at trial, and thus, it would have been of little aid to counsel when impeaching those witnesses. Lastly, it is unclear how obtaining Ms. Perez's grand jury testimony prior to trial would have altered the defense strategy at trial, which was to discredit the children's statements by using their prior inconsistent statements at interviews with Ms. Perez and by arguing the inherent incredibility of their testimony. Overall, Mitchell has not established that a reasonable

possibility exists that the result of the proceeding would have been different had his counsel requested additional discovery or obtained the grand jury transcript prior to trial. Certainly then, he cannot overcome the deference owed to the state court's decision on this issue.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that ground for relief 1(C) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 4. *Trial Counsel's Failure to Move the Trial Court to Have the Child Witnesses Psychologically Examined*

Next, Mitchell avers that trial counsel was ineffective when he failed to move the trial court to have C.O., V.O., and W.O. psychologically examined for signs of "coaching." (ECF No. 2 at 7). Mitchell asserts that the delay in the children reporting the abuse and the inconsistencies between their statements should have signaled to defense counsel that psychological examinations were necessary. (ECF No. 28 at 19). Mitchell argues that the results of the examinations would have impeached the children's testimony at trial. (*Id.*) The state circuit court determined that Mitchell's claim was not cognizable in a state habeas proceeding, and the WVSCA adopted that conclusion. (ECF No. 10- at 14); *Rodger M.*, 2015 WL 3952698, at *1.

Even under a *de novo* standard of review, Mitchell's claim does not entitle him to relief because, assuming *arguendo* that counsel's performance was deficient, he cannot establish prejudice. First, Mitchell has not offered any evidence that a psychological examination of the victims would have revealed that they were coached or that their

- 47 -

statements concerning the abuse were false. Likewise, Mitchell has not established that a psychological examination of the victims would have produced admissible evidence. *See Parker v. Scott*, 394 F.3d 1302, 1323 (10th Cir. 2005); *Thompson v. Parker*, No. CIV-09-1136, 2010 WL 2610941, at *14 (W.D. Okla. Apr. 30, 2010) (rejecting similar claim where petitioner merely speculated as to what psychological examination of victim would have revealed).

Second, Mitchell has not demonstrated that the trial court would have granted a motion by the defense to have the witnesses psychologically examined. In West Virginia, a trial court may order a witness to undergo a psychological examination if "the requesting party ... present[s] the judge with evidence that he has a compelling need or reason for the ... examination[]." *State v. Delaney*, 417 S.E.2d 903, 907 (W. Va. 1992). When making this determination, a trial court must consider: "(1) the nature of the examination requested and the intrusiveness inherent in that examination; (2) the victim's age; (3) the resulting physical and/or emotional effects of the examination on the victim; (4) the probative value of the examination to the issue before the court; (5) the remoteness in time of the examination to the alleged criminal act; and (6) the evidence already available for the defendant's use." *Id.*

Here, defense counsel would likely have been unable to demonstrate a compelling need for the examination. The victims were sixteen or seventeen years old at the time of trial, and there was no question as to their competency to testify. *See O'Quinn v. Sec'y, Dep't of Corr.*, No. 6:09-cv-217, 2012 WL 750752, at *10 (M.D. Fla. Mar. 7, 2012) (rejecting similar claim where there was no indication that victim was incompetent to testify). There was seemingly scant additional information to be gained from any examination, considering that the transcripts of the children's interviews with Ms. Perez

and Officer Kenny were available to the defense and could have been reviewed for signs of "coaching." Furthermore, a psychological examination can be severely intrusive, particularly when asking a victim to recall physical or sexual abuse. Under West Virginia law, an abuse victim does not consent to being psychologically examined merely by reporting the abuse. Otherwise, a victim of physical or sexual abuse may decline to come forward and report his abuser for fear that he will be required to undergo a probing psychological examination. Overall, Mitchell has not made a convincing argument that the trial court would have found a compelling justification for ordering the examinations.

Because Mitchell has failed to offer any evidence as to what a psychological examination of the victims would have revealed, and it is unlikely that the trial court would have ordered the victims to undergo examinations, Mitchell's claim must fail. Thus, the undersigned **FINDS** that Mitchell is not entitled to relief on his claim that defense counsel should have moved for C.O., W.O., and V.O. to be psychologically examined for signs of "coaching." Consequently, the undersigned **RECOMMENDS** that ground for relief 1(E) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 5. *Trial Counsel's Failure to Object to and Report the Trial Court for Aiding the Prosecution*

Mitchell next argues that his counsel was ineffective for failing to object to and report the trial court for aiding the prosecution. (ECF No. 2 at 8). While Mitchell's explanation of his claim is convoluted and mostly centers on defense counsel's failure to object to the prosecutor's actions, Mitchell claims that defense counsel should have objected to the trial court allowing the jury to consider Counts 1, 2, 3, 4, and 5. (ECF No. 28 at 12). Specifically, Mitchell argues that defense counsel erred in failing to object to the

prosecutor introducing evidence during the June 2002 grand jury proceeding regarding Mitchell supplying alcohol to C.O. in March 2000. (*Id.* at 11). Mitchell insists that the statute of limitations for the crime of contributing to the delinquency of a minor had expired by the time that the June 2002 grand jury heard Ms. Perez's testimony and that the alleged conduct could not be used to prosecute Mitchell. (*Id.*) Mitchell contends that his purported actions in supplying alcohol to C.O. were utilized to obtain an indictment on Counts 1, 2, 3, 4, and 5, which alleged that Mitchell sexually abused C.O., because C.O. claimed that she drank alcohol with Mitchell on the same day that he sexually abused her. (*Id.* at 12). Accordingly, Mitchell believes that defense counsel should have objected to the trial court allowing the jury to decide Counts 1, 2, 3, 4, and 5.

The state circuit court characterized Mitchell's claim as one that defense counsel was ineffective for failing to object to the trial court aiding the State in responding to the defense's motion for judgment of acquittal after the State rested. (ECF No. 10-1 at 13). The circuit court noted that, in discussing the defense's motion for acquittal, the trial court indicated that there was no evidence concerning the amount of alcohol in each drink consumed by C.O., and therefore, the jury should decide C.O.'s credibility as it related to the March 2000 sexual abuse counts. (*Id.*) The State adopted this reasoning in responding to the defense's motion. (*Id.*) After summarizing the portion of the transcript pertinent to Mitchell's claim, the circuit court denied the claim and found that there was no basis for defense counsel to object to the trial court conducting an analysis on the defense's motion that questioned the defense's arguments. (*Id.* at 14). The WVSCA adopted the circuit court's findings and conclusions on the matter. *Rodger M.*, 2015 WL 3952698, at *1.

Having reviewed Mitchell's amended state habeas petition, the undersigned notes that Mitchell's claim in state court was seemingly divided into two parts. The first

component, Mitchell's claim regarding the trial court's analysis of the motion for acquittal, was addressed and denied by the state circuit court. The second part, Mitchell's claim regarding the statute of limitations described above, was not explicitly addressed by the state courts. *Mitchell*, No. 2:14-cv-12761, Dkt. No. 15-2 at 128-29. Accordingly, Mitchell's particular argument that is currently before this court was presented, but not address by, the state courts.

In any event, even without the application of AEDPA deference to the instant claim, Mitchell is not entitled to relief for at least three reasons. First, defense counsel did object to the trial court's ruling that the State could introduce, at trial, evidence that Mitchell supplied alcohol to C.O. in March 2000. As such, Mitchell is mistaken that his counsel did not object to the jury's consideration of such evidence. Second, there is no indication that defense counsel would have been successful if he had specifically objected to the grand jury or petit jury considering the evidence on the ground that the statute of limitations had passed for criminally charging Mitchell related to his actions in supplying alcohol to C.O. in March 2000. To the contrary, the statute of limitations only prevented Mitchell from being criminally charged for his conduct; it did not bar consideration of Mitchell's conduct by the grand jury or petit jury. Third, defense counsel did move for a judgment of acquittal on the sexual abuse counts after the State rested and at the conclusion of the trial. When the trial court denied the motion, defense counsel objected to preserve the issue for appeal. Lastly, insofar as Mitchell might generally contend that defense counsel should have objected to the trial court's bias toward the State, that claim is unconvincing for the reasons set forth below in the Judicial Misconduct discussion.

Accordingly, the undersigned **FINDS** that Mitchell is not entitled to relief on his claim that defense counsel should have objected to the trial court's aiding of the

prosecution. Therefore, the undersigned **RECOMMENDS** that ground for relief 1(F) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 6. *Trial Counsel's Failure to Move the Court to Impeach Ms. Perez's Testimony to the Grand Jury*

In his seventh claim of ineffective assistance of trial counsel, Mitchell contends that his trial counsel was ineffective for failing to move the trial court "to impeach the State's witness, Jill Perez's testimony to the grand jury for false swearing and [perjury]." (ECF No. 2 at 8). Mitchell argues that defense counsel failed to obtain a copy of the grand jury transcript, and as a result, defense counsel was unable "to point out to the court or trial jury the many known acts of false swearing and [perjury]" by Ms. Perez. (*Id.*) The state circuit court found that Mitchell's claim did not raise a constitutional issue, and therefore, the claim was not cognizable in state habeas proceedings. (ECF No. 10-1 at 14). The WVSCA agreed. *Rodger M.*, 2015 WL 3952698, at *1.

Reviewing Mitchell's contention *de novo*, he is not entitled to relief. It is unclear exactly what Mitchell faults defense counsel for failing to do. To the extent that Mitchell claims that defense counsel could have used Ms. Perez's grand jury testimony to obtain a dismissal of the indictment, Mitchell's claim is unconvincing because Ms. Perez's testimony supported the charges contained in the indictment. Furthermore, insofar as Ms. Perez's testimony may have been inconsistent with the children's interview statements, a petit jury convicted Mitchell of some of the charges, and other charges were dismissed by the trial court. Therefore, any error by defense counsel in failing to seek dismissal of the indictment on that ground was either harmless or made moot by dismissal of the convictions. *See United States v. Mechanik*, 475 U.S. 66, 67, 106 S. Ct.

938, 89 L. Ed. 2d 50 (1986) (holding conviction by petit jury rendered harmless any error in grand jury proceeding). In addition, to the extent that Mitchell argues that trial counsel should have pointed out Ms. Perez's alleged acts of perjury at trial, Ms. Perez did not testify at trial, and therefore, defense counsel did not have an opportunity to impeach her. For reasons explained below, trial counsel acted reasonably in not calling Ms. Perez as a witness at trial. Finally, Mitchell has not shown that any inconsistencies between Ms. Perez's grand jury testimony and the children's interview statements fall within the ambit of perjury or that Ms. Perez knowingly lied to the grand jury, rather than made honest mistakes regarding her recollection of the interviews.

Therefore, the undersigned **FINDS** that Mitchell is not entitled to relief on his claim that defense counsel failed to move the trial court to impeach Ms. Perez's grand jury testimony. Therefore, the undersigned **RECOMMENDS** that ground for relief 1(G) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 7.  *Trial Counsel's Failure to Call an Expert Witness*

Mitchell also insists that trial counsel was ineffective for failing to call an expert witness at trial to testify to the effects of alcohol on a child of C.O.'s age and weight. (ECF No. 2 at 8-9). Mitchell argues that C.O.'s testimony as to the amount that she drank with Mitchell on March 9, 2000 was incredible and that an expert would have "testified that there is no possible way that C.O. could have ingested so much alcohol but have so little trouble recalling the negative things she reported happen[ing]." (ECF No. 28 at 20). In addition, Mitchell asserts that an expert would have testified that the credibility of C.O.'s statements concerning the sexual abuse in March 2000 was discounted as a result of "diminished capacity." (*Id.*) The state circuit court determined that this claim was not

cognizable in a state habeas proceeding, and the WVSCA adopted that conclusion. (ECF No. 10-1 at 14); *Rodger M.*, 2015 WL 3952698, at *1.

Preliminarily, the undersigned notes that Mitchell has failed to present any evidence as to the substance of a purported expert witness's testimony in this case. Mitchell has not offered the testimony or an affidavit of an expert on the effects of alcohol on a person's body. Therefore, Mitchell's claim fails for lack of proof. Nevertheless, Mitchell's trial counsel acted reasonably in refraining from calling an expert witness to testify regarding the effects of alcohol on C.O.'s bodily functioning and memory. Trial counsel wisely argued to the jury that C.O.'s testimony on the topic defied common sense. *See Young v. Gipson*, ____ F. Supp. 3d ____, 2015 WL 5316402, at *33 (N.D. Cal. Sept. 11, 2015) ("A decision to appeal to the jury's common sense, rather than to attempt to impress them with expert testimony, does not demonstrate incompetence, but is instead a rational tactical choice."); *Jahagirdar v. United States*, 597 F. Supp. 2d 198, 203 (D. Mass. 2009) (rejecting claim that counsel was ineffective for failing to call expert witness and finding that expert testimony would not have been appropriate where jurors could rely on common sense and experience in considering issue). An expert witness almost certainly would not have added anything of substance to the defense's theory. *See Frimpong v. MacDonald*, No. CV 12-6995, 2014 WL 1779492, at *29 (C.D. Cal. May 5, 2014) (concluding that counsel was not ineffective for failing to call expert witness on intoxication where expert testimony would have "added little" to defense's effort to undermine victim's credibility based on intoxication and collecting cases supporting proposition that jurors, as lay people, are capable of evaluating effects of intoxication on witness memory). On the other hand, an expert witness might have made concessions on cross-examination that were harmful to the defense. *See Boothe*, 2016 WL 1275054, at

*25 (finding defense counsel acted reasonably in refraining from calling expert witness at trial given potential for damaging concessions). For instance, a defense expert could have acknowledged on cross-examination that an amount of alcohol exists, per drink, that C.O. could have consumed and still recalled the abuse, which would have bolstered the State's theory. Moreover, counsel could have concluded that expert testimony was unnecessary because the State did not present expert testimony on the issue, and thus, there would be no need to rebut the expert opinion of a State's witness. Ultimately, trial counsel's decision to appeal to the jury's common sense, rather than get bogged down in the particulars of expert testimony, was a rational one.

Therefore, the undersigned **FINDS** that Mitchell is not entitled to relief on his claim that trial counsel was ineffective for failing to call an expert witness at trial. Therefore, the undersigned **RECOMMENDS** that ground for relief 1(H) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 8. *Trial Counsel Denied, and Allowed the Prosecutor to Deny, Mitchell's Sixth Amendment Right to Confront Ms. Perez and Officer Kenny*

Mitchell also asserts that trial counsel was ineffective when he failed to call Ms. Perez and Officer Kenny as witnesses at trial. (ECF No. 2 at 9). Mitchell contends that Ms. Perez and Officer Kenny should have been called to establish that Ms. Perez committed perjury before the grand jury. (ECF No. 28 at 21). Specifically, Mitchell argues that Ms. Perez lied with respect to the facts underlying Count 6 of the indictment. (*Id.* at 21 n.8). Mitchell likewise claims that Ms. Perez committed perjury when she testified before the grand jury that both C.O. and V.O. stayed home from school together to drink alcohol on March 9, 2000 because Officer Kenny testified before the grand jury in 2001 that C.O.

and **W.O.** were provided alcohol by Mitchell and that the children were provided alcohol on different dates. (*Id.*) In addition, Mitchell asserts that Ms. Perez and Officer Kenny should have been called to testify to the improper interview techniques that they used when questioning the children and the children's motives for fabricating their stories of abuse. (*Id.* at 22). Separately, Mitchell argues that trial counsel allowed the State to deny his Sixth Amendment right to confront Ms. Perez and Officer Kenny. (ECF No. 2 at 9).

The state circuit court concluded that Mitchell's claim was not cognizable in a state habeas proceeding. (ECF No. 10-1 at 14). The WVSCA adopted the circuit court's conclusion the issue. *Rodger M.*, 2015 WL 3952698, at *1.

Beginning with Mitchell's claim that defense counsel should have called Ms. Perez and Officer Kenny to testify at trial, trial counsel's decision not to call a particular witness is a matter of trial strategy that is "virtually unchallengeable." *United States v. Orr*, 636 F.3d 944, 955 (8th Cir. 2011); *see also Fields v. United States*, No. 5:12-cv-642, 2013 WL 5707255, at *9 (E.D.N.C. Oct. 21, 2013); *United States v. Gavegnano*, No. 3:05cr17-1, 2012 WL 1884136, at *6 (W.D. Va. May 22, 2012); *McClure v. United States*, No. DKC 08-1830, 2011 WL 3511816, at *3 (D. Md. Aug. 10, 2011). Indeed, the Fourth Circuit has recognized that "'the decision whether to call a defense witness is a strategic decision' demanding the assessment and balancing of perceived benefits against perceived risks, and one to which '[a court] must afford enormous deference.'" *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) (quoting *United States v. Kozinski*, 16 F.3d 795, 813 (7th Cir. 1994)) (marking omitted).

Here, trial counsel acted reasonably in declining to call Ms. Perez and Officer Kenny to testify at trial. First, assuming *arguendo* that the inconsistencies between Ms. Perez's 2002 grand jury testimony and Officer Kenny's 2001 grand jury testimony exist

as described by Mitchell, the benefit of having Ms. Perez and Officer Kenny concede those inconsistencies was far outweighed by the certainty that Ms. Perez and Officer Kenny would have corroborated much of the children's testimony at trial. Indeed, the portion of Officer Kenny's 2001 grand jury testimony that Mitchell has supplied to the court reveals that Mitchell played the "game" with the children and provided alcohol to C.O. and W.O. (ECF No. 26-3 at 21). Additionally, Officer Kenny's police report indicates that the children's mother confirmed that C.O. had informed her that Mitchell had "sexually touch[ed]" her. (*Id.* at 30). Although hearsay if admitted for the truth of the matter asserted, if Officer Kenny were permitted to testify that the mother corroborated C.O.'s testimony, that fact would have been overwhelmingly damaging to the defense. As summarized in the background section above, Ms. Perez's grand jury testimony likewise supports the children's testimony at trial. Second, trial counsel would have likely hurt the defense's credibility by offering a theory that Ms. Perez and Officer Kenny conspired to commit perjury in order to obtain an indictment against Mitchell. Third, there is no evidence that Ms. Perez or Officer Kenny would have admitted that they used improper interview techniques or that the children's stories were fabricated. Moreover, defense counsel could have reasonably concluded that questioning the interview techniques used by Ms. Perez and Officer Kenny would not be beneficial. To the contrary, defense counsel may have calculated that, if the interviews appeared valid, then the impeachment of the children by their interview statements would be more effective. Fourth, defense counsel ably identified the inconsistencies in the children's stories on cross-examination using the interview transcripts, and as such, defense counsel was able to avoid the risk presented by calling two other witnesses who would have largely supported the children's stories. Fifth, to the extent that Mitchell argues that the "most damaging" untruth told by Ms.

Perez to the grand jury related to Count Six, that count was ultimately dismissed after the jury could not reach a unanimous verdict. (ECF No. 28 at 21 n.8). In sum, given the "enormous deference" to which counsel's strategic decision is entitled, and the numerous risks associated with calling Officer Kenny or Ms. Perez to testify, the undersigned finds that trial counsel acted reasonably in refraining from Ms. Perez and Officer Kenny at trial. *Terry*, 366 F.3d at 317.

Finally, Mitchell's claim that trial counsel allowed the State to deny his right to confront Ms. Perez and Officer Kenny is unfounded. As indicated in the Prosecutorial Misconduct discussion below, the Sixth Amendment does not require the State to call any particular witness at trial. Consequently, any objection by defense counsel at trial that the State denied Mitchell his right to confront Ms. Perez and Officer Kenny would have been frivolous, and "[a]n attorney is not ineffective for abstaining from impractical objections." *Green v. Ballard*, No. 3:02-cv-1348, 2015 WL 1612198, at *30 (S.D.W.Va. Apr. 10, 2015).

Therefore, the undersigned **FINDS** that Mitchell is not entitled to relief on his claim that trial counsel was ineffective for failing to call Ms. Perez and Officer Kenny to testify at trial, and for allowing the State to deny his right to confront those witnesses. Therefore, the undersigned **RECOMMENDS** that ground for relief 1(I) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 9.  *Trial Counsel's Failure to Raise the Issue of Mitchell's Competency to Stand Trial and Assist in His Own Defense*

In his tenth claim of ineffective assistance of counsel, Mitchell argues that trial counsel performed deficiently when he failed to raise the issue of Mitchell's competency to stand trial and assist in his own defense prior to trial. (ECF No. 2 at 9). Mitchell insists

that "the very nature of the crimes" with which he was charged "call[] into question his sanity and his ability to assist in his defense." (ECF No. 28 at 7). Mitchell asserts that, while awaiting trial in the 2001 case, he had been hospitalized for suicide attempts. (*Id.*) Mitchell explains that he did not initially cooperate with the court ordered psychiatric evaluations because he was "paranoid" and "did not believe that the examination[s] would benefit him." (*Id.* at 8). According to Mitchell, at a June 2003 evaluation, the evaluator concluded that Mitchell's MMPI-II results were consistent with someone who is suspicious of and distrusts others. (*Id.*) That same evaluator suggested that Mitchell may suffer from "frontal lobe brain damage." (*Id.*) Mitchell claims that, at a later mental evaluation in January 2004, the evaluators observed evidence of "paranoid features" without "overt psychosis." (*Id.*) Those evaluators opined that Mitchell's "paranoia could impair his judgment and ability to make rational decisions regarding his defense." (*Id.*) Mitchell contends that "he could not have just suddenly, out of the blue, had all the[se] mental issues ... appear" after trial. (*Id.* at 9).

The state circuit court rejected Mitchell's claim. The circuit court noted that Mitchell was twice scheduled for psychiatric evaluation, but he refused to cooperate on both occasions. (ECF No. 10-1 at 14-15). The circuit court concluded that it would be "unconscionable" if Mitchell were "able to benefit from his lack of cooperation" by claiming that trial counsel was ineffective for failing to have Mitchell examined for competency prior to trial. (*Id.* at 15). The WVSCA adopted the circuit court's findings and conclusion. *Rodger M.*, 2015 WL 3952698, at *1.

"The Due Process Clause of the Fourteenth Amendment prohibits states from trying and convicting mentally incompetent defendants." *Beck v. Angelone*, 261 F.3d 377, 387 (4th Cir. 2001) (citing *Pate v. Robinson*, 383 U.S. 375, 384-86, 86 S.Ct. 836, 15

L.Ed.2d 815 (1966)). "The test for determining competency is whether '[a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding ... and whether he has a rational as well as a factual understanding of the proceedings against him.'" *Id.* (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)) (brackets and ellipsis in original). "Not every manifestation of mental illness demonstrates incompetence to stand trial; rather, the evidence must indicate a present inability to assist counsel or understand the charges." *Id.* at 388 (quoting *Burket v. Angelone*, 208 F.3d 172, 192 (4th Cir. 2000)) (markings omitted). "[A] State may presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence." *Cooper v. Oklahoma*, 517 U.S. 348, 355, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996). Under West Virginia law, a trial court "make[s] a finding of fact upon a preponderance of the evidence as to the defendant's competency to stand trial based on whether or not the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and whether he or she has a rational as well as a factual understanding of the proceedings against him or her." W. Va. Code § 27-6A-3(c).

Having reviewed the record, the undersigned cannot conclude that the state court's decision on this claim is contrary to, or an unreasonable application of, clearly established federal law. To start, Mitchell's April 26, 2016 affidavit, wherein Mitchell states that he was "laboring under severe paranoia" when he refused to cooperate with the scheduled psychological evaluations and that he twice attempted suicide while awaiting trial in the 2001 case, was not before the state court when it adjudicated Mitchell's claim on the merits. Therefore, this court cannot consider the affidavit in evaluating the state court's determination under § 2254(d)(1). *See Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S. Ct.

1388, 179 L. Ed. 2d 557 (2011) (holding that when analyzing a state court's rejection of a state prisoner's claim under § 2254(d)(1), a federal habeas court is "limited to the record that was before the state court that adjudicated the claim on the merits.").

Even considering the affidavit, Mitchell has failed to identify any evidence, other than his two suicide attempts while awaiting trial in an earlier case, that would have caused trial counsel to seek a competency evaluation in the instant case. Not once before trial in this case was there any indication that Mitchell did not have an understanding of the proceedings against him or that he was unable to consult with trial counsel. *See Clanton v. Bair*, 826 F.2d 1354, 1358 (4th Cir. 1987) (recognizing that Constitution does not require a psychiatric evaluation in every criminal case). Indeed, the arraignment transcript reflects that Mitchell understood the charges and proceedings against him. (ECF No. 10-14). Similarly, Mitchell's colloquy concerning his right to testify reflects that he understood the proceedings while the trial was ongoing. (ECF No. 10-11 at 190-93). Mitchell's conspiracy theory surrounding his conviction and imprisonment did not surface until after Mitchell was convicted. *Cf. Aldridge v. Thaler*, No. H-05-608, 2010 WL 1050335, at *34 (S.D. Tex. Mar. 17, 2010) (collecting cases to support proposition that courts "have found a defendant incompetent when he integrates trial counsel and the trial courts into conspiratorial delusions" prior to or during trial). Even then, the trial court stated at a January 2004 hearing that he found Mitchell to be competent, albeit without a competency hearing. (ECF No. 10-7 at 30). The trial court's statement on the issue occurred after the court had observed Mitchell's in-court conduct before, during, and after trial. Moreover, the trial court recognized that its initial post-trial order for a competency evaluation was for the purpose of obtaining an opinion as to Mitchell's candidacy for sexual abuse counseling, not to determine whether Mitchell was competent to stand trial.

Additionally, the subsequent evaluations of Mitchell for the purpose of direct appeal are not in the record before this court. Nevertheless, assuming that Mitchell's summary of those reports is accurate, there is no definite indication from those reports that Mitchell was not competent to stand trial in November 2002. The strongest statement that Mitchell cites is from the January 2004 report, wherein the evaluators purportedly stated that Mitchell's "paranoia could impair his judgment and ability to make rational decisions regarding his defense." Yet, Mitchell has not argued that the evaluators offered an opinion that he was incompetent to stand trial, and the paranoia discussed by the evaluators presumably related to Mitchell's conspiracy theory that he developed post trial. There is no indication from the record or Mitchell's summary of the January 2004 report that Mitchell's trial counsel was aware, prior to or during trial, that Mitchell did not understand the nature of the proceedings against him or could not rationally consult with counsel.

Even if Mitchell's counsel rendered deficient performance in failing to raise the issue of Mitchell's competency, Mitchell has not sufficiently demonstrated prejudice flowing from counsel's error. Specifically, Mitchell has not presented evidence that the trial court would have found him incompetent to stand trial had defense counsel raised the issue. In fact, the trial court's only comment on the issue belies any prejudice argument.

Accordingly, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that ground for relief 1(J) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 10. Trial Counsel Allowed the Police and Child Protective Services to Use Improper Interview Techniques

Next, Mitchell argues that his trial counsel was ineffective for allowing "the police and C.P.S." to use improper interview techniques while questioning the children. (ECF No. 2 at 10). Mitchell insists that the presence of Officer Kenny at the interviews intimidated the children into "say[ing] what the man with the gun wanted them to say." (ECF No. 28 at 22-23). Additionally, Mitchell asserts that the break between the April 2001 and May 2001 interviews permitted the children to "come up with a story that would get rid of [Mitchell] for good." (*Id.* at 23). Mitchell also claims that Ms. Perez and Officer Kenny should have questioned the children as to whether they were fabricating their stories. (*Id.*) Lastly, Mitchell contends that trial counsel should have called Ms. Perez and Officer Kenny as witnesses at trial to point out the deficiencies in the techniques used to question the children. (*Id.*)

The state circuit court found that Mitchell's claim did not allege a violation of a constitutional right, and therefore, the claim was not cognizable in a state habeas proceeding. (ECF No. 10-1 at 15). The WVSCA adopted the circuit court's conclusion. *Rodger M.*, 2015 WL 3952698, at *1.

Reviewing the claim *de novo*, the undersigned concludes that Mitchell is not entitled to relief. Mitchell does not explain how his trial counsel could have prevented Ms. Perez and Officer Kenny from using the purportedly inappropriate interview tactics in April and May 2001. Indeed, Mitchell was not represented by counsel in relation to the instant case at the time of those interviews since the first indictment was not issued until June 2001. (ECF No. 26-2 at 61). Accordingly, Mitchell cannot demonstrate that his counsel acted unreasonably.

Furthermore, the allegedly improper techniques identified by Mitchell are not actually improper. The presence of a police officer during an interview does not *per se* taint the interview; indeed, many child abuse victims are interviewed by police officers or Child Protective Services workers accompanied by police officers. Similarly, interviewing a victim on more than one occasion is not, on its face, inappropriate; rather, multiple interviews over a span of time may actually ensure the consistency of the victim's statements, or help the victim remember particular details of the abuse. More than one interview may be necessary for the victim to feel comfortable to report the abuse and to follow up with the victim regarding facts learned from other sources. Additionally, Mitchell has failed to offer any evidence that the standard procedure for a police officer or Child Protective Services worker when interviewing an alleged abuse victim is to attack the victim's veracity and accuse the victim of fabrication. Quite the opposite, such an approach would discourage victims from reporting abuse and from maintaining that the abuse occurred. Finally, as explained above, Mitchell cannot demonstrate that counsel was ineffective for failing to call Ms. Perez and Officer Kenny as witnesses at trial.

Accordingly, the undersigned **FINDS** that Mitchell is not entitled to relief on his claim that defense counsel allowed Ms. Perez and Officer Kenny to use improper interview techniques. Therefore, the undersigned **RECOMMENDS** that ground for relief 1(K) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 11. *Trial Counsel Failed to Object to the Trial Court for Only Dismissing Counts 7, 8, 10, 11, 12, and 15*

In his final claim of ineffective assistance of counsel, Mitchell asserts that defense counsel was ineffective when he failed to object when the trial court only dismissed

Counts 7, 8, 10, 11, 12, and 15. (ECF No. 2 at 10). Mitchell failed to address this issue in his response memoranda. The state circuit court rejected Mitchell's claim, finding that defense counsel objected to, and preserved for appeal, the trial court's partial denial of the defense's post-trial motion to dismiss all counts. (ECF No. 10-1 at 15). Accordingly, the circuit court concluded that there was no basis for Mitchell's claim that defense counsel failed to object. The WVSCA agreed with the circuit court. *Rodger M.*, 2015 WL 3952698, at *1.

Mitchell is mistaken that his trial counsel failed to object to the trial court's partial denial of the defense's post-trial motion to dismiss. As the state circuit court found, the trial court's order on the defense's motion to dismiss notes that "the objections and exceptions of the Defendant are noted and preserved for appeal." (ECF No. 10-2 at 2). Thus, defense counsel moved for the dismissal of all counts post trial and subsequently objected to the trial court's partial denial of the motion. Consequently, Mitchell's claim is factually unfounded.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that ground for relief 1(L) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### B. Prosecutorial Misconduct

Next, Mitchell raises several claims of prosecutorial misconduct. There are a great variety of ways that a prosecuting attorney may "overstep[] the bounds of ... propriety and fairness," including misstating facts during the examination of witnesses, "assuming prejudicial facts not in evidence," "bullying and arguing with witnesses," making an

improper argument to the jury "containing improper insinuations and assertions calculated to mislead the jury" regarding the facts or the law, knowingly eliciting perjured testimony at trial or before a grand jury, or suppressing evidence favorable to the accused. *United States v. Williams*, 504 U.S. 36, 60-61, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (Stevens, J. dissenting) (quoting *Berger v. United States*, 295 U.S. 78, 84-85, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). "When specific guarantees of the Bill of Rights are involved," federal courts must take "special care to assure that prosecutorial conduct in no way impermissibly infringes them." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). "By contrast, when such provisions are not at issue, a finding of error as to a prosecutor's remark [or conduct] requires that it 'so infected the trial with unfairness as to make the resulting verdict a denial of due process.'" *United States v. Runyon*, 707 F.3d 475, 507 (4th Cir. 2013) (marking omitted). For example, when a prosecutor offers remarks that touch on a defendant's privilege against self-incrimination, a court must determine whether those statements "so prejudiced [the] specific right ... as to amount to a denial of that right." *Donnelly*, 416 U.S. at 643. On the other hand, where a prosecutor's comments or conduct do not implicate a particular constitutional right held by the defendant, then the analysis centers on whether the prosecutor's conduct generally violated a defendant's right to due process. *Id.* "[A] court making [this] due process inquiry must consider the challenged conduct in relation to the proceeding as a whole." *Humphries v. Ozmint*, 397 F.3d 206, 218 (4th Cir. 2005). "The analysis of a due process claim premised on unfair prosecutorial conduct ... depend[s] upon numerous factors, which include the nature of the prosecutorial misconduct, the extent of the improper conduct, the issuance of curative instructions from the court, any defense conduct inviting the improper prosecutorial response, and the weight of the

evidence." *Id.* (citations omitted). With these standards in mind, the undersigned turns to Mitchell's specific claims of prosecutorial misconduct.

### 1. The Prosecutor Permitted and Encouraged Ms. Perez to Present False, Biased, and Misleading Evidence to the Grand Jury

In his first claim of prosecutorial misconduct, Mitchell contends that the prosecutor violated his right to due process by knowingly presenting false, "biasing," and misleading evidence to the grand jury. (ECF No. 2 at 13). Mitchell asserts that the prosecutor permitted Ms. Perez to falsely testify at the 2002 grand jury proceeding that Mitchell played the "Is there a God?" "game" with W.O. (*Id.*) Mitchell argues that Officer Kenny, while testifying before the grand jury in 2001, stated that Mitchell only played the "game" with C.O. and V.O., not W.O. (ECF No. 26 at 46-47; ECF No. 26-3 at 21-22). Mitchell avers that, before the indictment was dismissed in the 2001 case, the prosecutor moved to amend the 2001 indictment to reflect that the victim in the counts related to the "game" played by Mitchell was V.O., not W.O. (ECF No. 26 at 47; ECF No. 26-2 at 59). Mitchell points out that the prosecutor questioned Ms. Perez about W.O.'s involvement in the "game" at the June 2002 grand jury proceeding, and Ms. Perez testified that W.O. had informed her that Mitchell had placed a plastic bag over his head and poured lighter fluid on him. (ECF No. 26 at 47). Mitchell also cites the May 10, 2001 interview between W.O. and Ms. Perez, where W.O. stated that Mitchell "never got [him]" during the "game." (ECF No. 26-2 at 57).

The circuit court denied Mitchell's claim, stating:

It appears that [Mitchell] argues because Jill Perez testified before the 2001 grand jury that it was W.O., rather than V.O., who stayed home from school and drank with [Mitchell] and C.O., she perjured herself during the 2002 grand jury testimony when she stated that it was V.O., rather than W.O. The Court finds that the State presenting the same witness with corrected

> testimony before the 2002 grand jury does not amount to prosecutorial
> misconduct or the presentment of perjured testimony.

(ECF No. 10-1 at 17). The WVSCA agreed with the circuit court's reasoning and

adopted the court's conclusion. *Rodger M.*, 2015 WL 3952698, at *1.

"[A] State may not knowingly use false evidence, including false testimony, to

obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d

1217 (1959). The knowing use of false evidence by "representatives of the State" to convict

an accused violates due process. *Id.* While *Napue* makes clear the prohibition on the use

of false testimony *at trial*, federal law is less established in the grand jury context. Indeed,

other federal courts have indicated that there is no "Supreme Court authority supporting

[a] claim that a prosecutor's knowing presentation of false testimony to a grand jury

violates a criminal defendant's constitutional rights." *United States ex rel. Changyaleket

v. McCann*, No. 07 C 1694, 2008 WL 5157976, at *5 (N.D. Ill. Dec. 8, 2008); *see also

Anderson v. Sec'y for Dep't of Corr.*, 462 F.3d 1319, 1327 (11th Cir. 2006) ("There is no

Supreme Court precedent clearly establishing a constitutional rule that, irrespective of

prosecutorial misconduct, an indictment must be dismissed because of perjured grand

jury testimony where the perjurious testimony is not repeated before the petit jury which

convicts."); *Herrera v. Falk*, No. 15-cv-136, 2015 WL 7717215, at *13 (D. Colo. Nov. 30,

2015) (same); *Magee v. Butler*, No. 14-cv-6879, 2015 WL 5951877, at *8 (N.D. Ill. Oct. 13,

2015) ("[T]here is no clearly established Supreme Court law saying that a prosecutor's

knowing presentation of perjured testimony before a grand jury violates a criminal

defendant's constitutional rights."). Mitchell has failed to cite any clearly established

federal law to directly support the contention that the prosecutor's knowing use of false

testimony at a grand jury proceeding entitles a § 2254 petitioner to relief.

Outside of the habeas context, the Supreme Court has held that a federal district court may dismiss an indictment prior to the trial's conclusion on the basis of prosecutorial misconduct where "'it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256, 108 S. Ct. 2369, 101 L. Ed. 2d 228 (1988) (quoting *Mechanik*, 475 U.S. at 78 (O'Connor, J., concurring)). In *Mechanik*, the Supreme Court held that a "petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendant[] with the offenses for which [he was] convicted," and that "the societal costs of retrial after a jury verdict of guilty are far too substantial to justify setting aside the verdict simply because of an error in the earlier grand jury proceedings." 475 U.S. at 67, 73. Although the Fourth Circuit has recognized that *Mechanik* seems "to foreclose [a] claim that the indictment must be dismissed because of misconduct before the grand jury," the Court has nevertheless "gone on to consider whether the prosecutorial misconduct 'substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations.'" *United States v. Chapman*, 209 F. App'x 253, 273 (4th Cir. 2006) (quoting *United States v. McDonald*, 61 F.3d 248, 253 (4th Cir. 1995), *overruled on other grounds by United States v. Wilson*, 205 F.3d 720, 724 n.1 (4th Cir. 2000)). However, the Fourth Circuit has cautioned that "[r]elief from an erroneous indictment after a case has been decided by a petit jury is rarely granted." *McDonald*, 61 F.3d at 252.

In this case, the undersigned preliminarily notes that the state circuit court mischaracterized Mitchell's claim by asserting that the issue raised by Mitchell concerned

which of the children remained at home to drink alcohol with Mitchell in March 2000. Mitchell's amended state habeas petition made clear that the issue was whether W.O. ever played the "game" with Mitchell. *Mitchell*, No. 2:14-cv-12761, Dkt. No. 15-2 at 142-43.

Nevertheless, Mitchell is not entitled to relief on this claim. First, as indicated previously, Mitchell has cited no clearly established federal law that precisely supports his claim. Second, there is less than sufficient evidence to conclude that the prosecutor knowingly used false testimony from Ms. Perez to secure the indictment. While Mitchell correctly points out that W.O. denied ever being caught by Mitchell during the "game" at the May 10, 2001 interview, Mitchell has not supplied the entire transcript of that interview for the court's review. Assuming that W.O. never mentioned being caught during the remainder of the May 2001 interview, which W.O. acknowledged at trial, Ms. Perez testified before the grand jury that she had spoken with the children about the "game" after that interview. (ECF No. 10-13 at 22). Although Ms. Perez stated that the children's stories had not changed since May 2001, it is possible that Ms. Perez learned about W.O.'s involvement in the game during a later conversation with W.O. and mistakenly forgot when she learned of W.O.'s involvement in the game. (*Id.*) W.O.'s trial testimony supports the notion that Ms. Perez could have made this excusable mistake since he testified that Mitchell poured lighter fluid on him and lit it. Furthermore, the prosecutor offered the transcripts of the children's statements to the grand jury during the June 2002 proceeding and also elicited testimony from Ms. Perez that was damaging to the children's credibility. (*Id.* at 18-21, 27). Certainly, those are not the actions of a prosecutor determined to secure an indictment by any means necessary. Lastly, a petit jury found Mitchell guilty of Count 15, which was the only charge related to W.O.'s involvement in the "game," beyond a reasonable doubt, but the trial court set aside that

verdict and dismissed the conviction. Accordingly, the sole count that this alleged prosecutorial misconduct relates to was dismissed after trial. For these reasons, even under a *de novo* standard of review, Mitchell's claim fails.

Accordingly, the undersigned **FINDS** that Mitchell is not entitled to relief on his first prosecutorial misconduct claim. Therefore, the undersigned **RECOMMENDS** that ground for relief 2(A) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 2. The Prosecutor Violated Due Process When She Knowingly Lied Regarding Discovery and Withheld Discovery Material

In his second and fourth claims of prosecutorial misconduct, Mitchell argues that the prosecutor knowingly lied about discovery and withheld discovery material from the defense. (ECF No. 2 at 13-14). Specifically, Mitchell insists that the prosecutor lied when she represented to defense counsel in an October 2002 letter that the discovery in the instant case was identical to the dismissed 2001 case against Mitchell. (*Id.* at 13). Mitchell contends that the "new discovery" in the instant case was the transcript of Ms. Perez's testimony at the June 2002 grand jury proceeding after the 2001 case was dismissed. (ECF No. 28 at 31). Furthermore, Mitchell asserts that the 2001 case was dismissed because the prosecutor withheld exculpatory evidence, and so, he accuses the prosecutor of doing the same in this case. (*Id.* at 31).

The state circuit court denied Mitchell's claims, concluding that Mitchell had failed to establish that the State possessed discovery material that was additional to the discovery disclosed in Mitchell's 2001 case. (ECF No. 10-1 at 17-18). In addition, because defense counsel did not request discovery, the circuit court found that the prosecutor was only obligated to provide to defense counsel with any exculpatory evidence and the 2002

grand jury transcript, if required by the West Virginia Rules of Criminal Procedure. (*Id.*)

The WVSCA adopted the circuit court's findings and conclusions on the matter. *Rodger*

*M.*, 2015 WL 3952698, at *1.

It is well established that a state violates a defendant's due process rights when it fails to disclose to the defendant "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Although Mitchell asserts that the prosecutor lied about and withheld discovery material, he has not specifically identified any discovery material that the prosecutor withheld, other than the 2002 grand jury transcript. Accordingly, Mitchell's claims are entirely speculative. Furthermore, to the extent that Mitchell contends the prosecutor withheld the 2002 grand jury transcript, the trial court ordered the production of the grand jury transcript to the defense as required by the West Virginia Rules of Criminal Procedure. (ECF No. 10-8 at 3). Assuming *arguendo* that the prosecutor failed to produce the 2002 grand jury transcript to the defense prior to trial, Mitchell has not explained why he was entitled to the transcript under the Rules of Criminal Procedure or how he was prejudiced by the prosecutor's actions. To the contrary, Ms. Perez's testimony before the grand jury was generally consistent with the children's testimony at trial, and Ms. Perez did not testify at trial, so the impeachment value of the grand jury transcript was minimal. *See Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (recognizing that petitioner raising *Brady* claim must demonstrate that prejudice ensued from the State's suppression of favorable evidence).

For these reasons, the undersigned **FINDS** that the state court's decisions on Mitchell's prosecutorial misconduct claims related to discovery are not contrary to, or an

unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that grounds for relief 2(B) and 2(D) be **DENIED**, and Respondent be **GRANTED** summary judgment on those grounds of Mitchell's § 2254 petition.

### 3. The Prosecutor Subjected Mitchell to an Indictment that Fails to Bar the Raising of Double Jeopardy and Multiple Punishments

Mitchell contends in his third claim of prosecutorial misconduct that the prosecutor subjected him "to an indictment that fails to bar the raising of [double] jeopardy and multiple punishments." (ECF No. 2 at 14). Mitchell argues that Counts 1, 2, and 3, and Counts 10, 11, 12, 13, and 14 of the indictment "read identically" and that the indictment does "not provide enough information to prevent and protect [Mitchell] from being sentenced repeatedly for the same continuing act committed." (ECF No. 26 at 50). Mitchell insists that the named counts failed the same transaction test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). (ECF No. 26 at 50-51).

The state circuit court found Mitchell's argument unpersuasive. First, the court noted that Counts 3, 10, 11, 12, and 14 were dismissed by the trial court, and therefore, Mitchell's claim as to those counts was moot. (ECF No. 10-1 at 17). Second, the circuit court found that Mitchell's contention with respect to the remaining counts was meritless. (*Id.*) The WVSCA agreed with the circuit court's findings and conclusions on the issue. *Rodger M.*, 2015 WL 3952698, at *1.

"The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth, provides that no person shall 'be subject for the same offence to be twice put in jeopardy of life or limb.'" *Brown v. Ohio*, 432 U.S. 161, 164, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977) (quoting U.S. Const. amend. V). Modernly phrased, "[t]he Double

Jeopardy Clause prohibits 'successive prosecutions for the same offense as well as the imposition of cumulative punishments for the same offense in a single criminal trial.'" *United States v. Gregory*, ____ F. App'x ____, 2016 WL 429913, at *2 (4th Cir. Feb. 4, 2016) (quoting *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012)). "Where a case involves multiple charges, the Double Jeopardy Clause is not offended where each charge requires proof of a distinct element." *Id.* (citing *Blockburger*, 284 U.S. at 304); *see also Blockburger*, 284 U.S. at 304 ("[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."); *United States v. Dixon*, 509 U.S. 688, 698, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) ("The same-elements test, sometimes referred to as the '*Blockburger*' test, inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution.").

At the outset, the undersigned notes that neither party provided a copy of the complete June 2002 indictment. Notwithstanding, Mitchell's claim does not warrant relief. As the state circuit court pointed out, Counts 3, 10, 11, 12, and 14 were dismissed by the trial court. In fact, Count 3 was dismissed on double jeopardy grounds with the agreement of the prosecutor. (ECF No. 10-11 at 149-51). Accordingly, Mitchell's hybrid prosecutorial misconduct-double jeopardy claim as to the dismissed counts cannot warrant relief. Separately, Mitchell's claim with respect to the remaining counts is unconvincing. As for Counts 1 and 2, a review of the trial court's jury instructions reveals that each offense required proof of a distinct element, even if all of Mitchell's acts were part of the same sexual abuse episode. *See James v. North Carolina*, No. 3:08-cv-366,

2011 WL 4025279, at *7-*8 (W.D.N.C. Sept. 9, 2011) (finding no double jeopardy violation where petitioner was convicted for three separate acts of sexual abuse "during a single episode of sexual assault"). With respect to Count 13, any double jeopardy issue was resolved by the dismissal of Count 14, which Mitchell asserts was identical to Count 13. Moreover, an indictment may charge the same crime if it occurred on two separate occasions, which was the case with Counts 13 and 14. Accordingly, Mitchell's claim that the prosecutor acted improperly by securing an indictment that violated the Double Jeopardy Clause is without merit.

Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that ground for relief 2(C) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 4. *The Prosecutor Denied Mitchell's Right to Confront Ms. Perez and Officer Kenny*

In his fifth claim of prosecutorial misconduct, Mitchell avers that the prosecutor denied Mitchell's right to confront Ms. Perez and Officer Kenny by failing to call them at trial. (ECF No. 2 at 14). Mitchell asserts that the prosecutor violated his Sixth Amendment right to confront witnesses against him and cross-examine them. (ECF No. 26 at 53-54). Mitchell insists that, had Ms. Perez and Officer Kenny been called to testify at trial, they would have testified to the illegal and criminal acts "committed by the officers of the court against [Mitchell]." (*Id.* at 54).

The state circuit court denied relief on Mitchell's claim and reasoned that the State retained discretion as to which witnesses to call at trial. (ECF No. 10-1 at 18). The state

circuit court also noted that the defense could have called Ms. Perez or Officer Kenny at trial. (*Id.*) The WVSCA agreed with the circuit court's rejection of the claim. *Rodger M.*, 2015 WL 3952698, at *1.

"[T]he Sixth Amendment's Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015) (quoting U.S. Const. amend. VI). "[T]he Sixth Amendment's right of an accused to confront the witnesses against him is ... made obligatory on the States by the Fourteenth Amendment." *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Under the Confrontation Clause, a criminal defendant possesses the right to "a face-to-face meeting with witnesses appearing before the trier of fact" and to cross-examine an adverse witness called by the State. *Coy v. Iowa*, 487 U.S. 1012, 1016-17, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

However, the Sixth Amendment's Confrontation Clause generally does not require a prosecutor to call any particular person as a witness at trial.[9] *See United States v. Smith*, ____ F. App'x ____, 2016 WL 158817, at *2-*3 (4th Cir. Jan. 14, 2016) (rejecting similar prosecutorial misconduct claim); *Whittaker v. Lafler*, 639 F. Supp. 2d 818, 825 (E.D. Mich. 2009) ("[T]he Confrontation Clause does not require the prosecution to call all the witnesses it has against the defendant."); *Jones v. Quarterman*, No. 3:04-cv-1596, 2007 WL 1793560, at *10 (N.D. Tex. June 21, 2007) (rejecting similar claim); *Munir v. White*, No. C-96-1289, 1997 WL 732523, at *3-*4 (N.D. Cal. Nov. 13, 1997) (same). Indeed, as the

---

[9] Of course, the Sixth Amendment prevents a State's witness from relaying testimonial hearsay statements to a jury without the defense being afforded an opportunity to cross-examine the declarant, and as such, guides a prosecutor in deciding which witnesses to call. *See Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)).

state court observed, it was within the prosecutor's discretion to decide which witnesses to call at trial, and the prosecutor's exercise of that discretion did not violate Mitchell's Sixth Amendment rights. Accordingly, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that ground for relief 2(E) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### 5. The Prosecutor's Improper Remarks

In his final allegation of prosecutorial misconduct, Mitchell cites several statements by the prosecutor during closing argument that he believes were improper. (ECF No. 2 at 15; ECF No. 26 at 54-59; ECF No. 28 at 32-37). First, Mitchell insists that the prosecutor violated the "golden rule" by inviting the jury to look at the case "from the children's viewpoint." (ECF No. 26-3 at 44; ECF No. 28 at 37). Second, Mitchell contends that the prosecutor vouched for the credibility of the State's witnesses by stating: (1) "[The children] did not fabricate dates or times."; (2) "There is no reason for you to conclude that [C.O.] or [V.O.] or [W.O.] are not telling the truth. There is no reason for you to conclude that they made this up or fabricated these stories."; (3) "[V.O.] and [C.O.] and [W.O.] are telling the truth."; and (4) "The State of West Virginia has proven beyond a reasonable doubt that [Mitchell] has committed the crimes charged, and the State of West Virginia trusts that you will find him guilty." (ECF No. 28 at 33). Third, Mitchell asserts that the prosecutor argued facts not in evidence when, on the subject of how much alcohol C.O. consumed, the prosecutor indicated: "Was it five percent orange juice and ninety-five percent vodka? Or more likely was it ninety-five percent orange juice and only five percent vodka? You want it to taste good so [C.O.] keeps drinking, so her barriers are

down, so she can't run from you. So you can abuse her." (*Id.* at 34). Fourth, Mitchell takes issue with the prosecutor's response to the defense's argument that the State failed to have Ms. Perez or Officer Kenny testify at trial, during which the prosecutor remarked that the defense could have called Ms. Perez or Officer Kenny to testify. (*Id.* at 35). Fifth, Mitchell avers that the prosecutor improperly argued, "[If] you don't believe these children, let the defendant walk out the door." (*Id.* at 36). Finally, Mitchell argues that the prosecutor acted inappropriately in stating, "All the children said they told their mom here in Jackson County [concerning the abuse], and nothing happened. Sometimes you just give up." (*Id.*)

After reviewing the allegedly improper statements, the state circuit court found that the prosecutor's comments "[did] not rise to the level of clear prejudice and did not result in manifest injustice." (ECF No. 10-1 at 18) (markings omitted). The WVSCA agreed with the circuit court. *Rodger M.*, 2015 WL 3952698, at *1.

As discussed above, in addressing improper comments by prosecutors, the Supreme Court has instructed that "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 180, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quoting *Donnelly,* 416 U.S. at 643); *see also Parker v. Matthews*, ____ U.S. ____, 132 S. Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (recognizing that *Darden* is clearly established federal law under AEDPA relevant to claim of improper comments by prosecutor). The Fourth Circuit has explained that, in analyzing a claim related to a prosecutor's purported improper comments, a court should look to a number of factors, including "(1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt

of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters [; ] ... (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel [;] ... and (6) whether curative instructions were given to the jury." *United States v. Baptiste*, 596 F.3d 214, 227 (4th Cir. 2010) (quoting *United States v. Wilson*, 135 F.3d 291, 299 (4th Cir.1998)) (ellipses in original).

To start, Mitchell is correct that an invitation for members of the jury to place themselves in the "crime victim's shoes" is improper and violates the so-called "golden rule." *See United States v. Williams*, 392 F. App'x 194, 196 (4th Cir. 2010). Respondent concedes that the prosecutor's remark to look at the case "from the children's viewpoint," was improper; however, Respondent insists that the comment did not render Mitchell's trial "fundamentally unfair." (ECF No. 11 at 27). The undersigned agrees that the prosecutor's isolated statement violating the "golden rule" did not deny Mitchell's right to due process. The comment was isolated and did not relate to an extraneous matter. In addition, the trial court instructed the jury that counsel's arguments were not evidence. Moreover, there was adequate evidence introduced at trial to establish Mitchell's guilt. Accordingly, the prosecutor's violation of the "golden rule" during closing argument does not entitle Mitchell to relief.

Next, Mitchell is right that it is generally inappropriate for an attorney to vouch for the credibility of a witness during argument. *See United States v. Hayes*, 322 F.3d 792, 800 (4th Cir. 2003) ("It is impermissible for a prosecutor to indicate her personal belief in the credibility of Government witnesses."). However, only two of the statements cited by Mitchell are potentially improper. Beginning with the acceptable arguments, the prosecutor's statement that the children did not fabricate dates or times was appropriate.

When read in context, the prosecutor was explaining that the children did not make up dates or time while testifying when they could not remember the exact date or time that an event happened. (ECF No. 10-11 at 273). Second, the prosecutor's argument that the State had proven the charges beyond a reasonable doubt did not explicitly vouch for the credibility of the State's witnesses. Turning to the potentially improper arguments, (1) that there was no reason for the jury to believe that the children were lying, and (2) that the children were telling the truth, it is unclear that these statements constituted vouching, rather than an argument explaining how the evidence supported the children's testimony. *See Justice v. Lafler*, No. 2:09-cv-13264, 2012 WL 2130916, at *10 (E.D. Mich. June 12, 2012) (finding similar remarks did not constitute improper vouching). Even if the two remarks were improper, the prosecutor's statements were in direct response to the defense counsel's theory in his opening statement and throughout his examination of the witnesses that the State's witnesses had fabricated the stories of abuse. *See United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993) (stating that "the extent to which the witness's credibility [is] attacked" is factor in vouching analysis). Furthermore, the prosecutor never expressed a personal belief that the State's witnesses were truthful. *See McCoy v. Hense*, No. 07-3508, 2011 WL 6813242, at *14 (C.D. Cal. Oct. 17, 2011) (finding state court could have reasonably concluded prosecutor did not improperly vouch for witness's credibility where prosecutor never stated personal belief as to veracity of witness's testimony and based argument that witness "told the truth" on "inferences drawn from the evidence"). Because the trial court instructed the jury that the parties' arguments were not evidence, and the prosecutor's remarks potentially vouching for the witnesses were sparse, were not related to extraneous matters, and were in response to the defense's theory that the State's witnesses were lying, the undersigned concludes that

the remarks did not deny Mitchell's right to due process.

In addition, Mitchell insists that the prosecutor argued facts not in evidence when discussing the subject of how much alcohol C.O. consumed. However, the prosecutor's remarks were not improper. The prosecutor was permitted to argue reasonable inferences from the evidence presented. Specifically, the prosecutor appropriately argued that the amount of alcohol in each of C.O.'s drinks must have been minimal for her to have consumed so many drinks and remembered the events of that day. Moreover, the prosecutor's statement was in response to the defense's argument that C.O. could not have consumed as much alcohol as she described and still recalled the events of March 9, 2000. (ECF No. 10-11 at 291-93, 304-05). Accordingly, Mitchell's claim regarding this comment is unpersuasive.

Mitchell also alleges that the prosecutor improperly asserted that Mitchell could have called Ms. Perez and Officer Kenny to testify. Again, the prosecutor's statement was directly in response to defense counsel's question in closing argument as to why Ms. Perez and Officer Kenny were not called to testify by the State. (*Id.* at 296, 306). There was nothing wrong with the prosecutor pointing out that the defense had equal access and ability to call as witnesses those persons whom the prosecutor declined to call. *See United States v. Williams*, No. CR 03-985, 2004 WL 5542771, at *3-*4 (C.D. Cal. Mar. 22, 2004) (recognizing that prosecutor's comments regarding defendant's failure to call witnesses "are generally permissible," particularly where "a defendant himself calls attention to the absence of a particular witness").

Next, Mitchell contends that the prosecutor violated his right to due process in stating: "[If] you don't believe these children, let the defendant walk out the door." (ECF No. 10-11 at 275). Mitchell insists that the prosecutor's comment "put the jurors to a guilt

trip." (ECF No. 28 at 36). At least one federal court has found a similar argument to be proper. *See Hopp v. Burt*, No. 03-10153, 2007 WL 162248, at *17 (E.D. Mich. Jan. 16, 2007) (finding prosecutor's comment that if stabbing was an accident, then let the defendant "go free," was proper because it was "an accurate statement of the law and indicated that the jury should acquit the petitioner and let him go free if they believed that the stabbing was an accident."). Although arguments regarding the "extrajudicial consequences" of a not guilty verdict have been condemned, the prosecutor's comment did not cross the line of propriety. *See United States v. Auch*, 187 F.3d 125, 132 (1st Cir. 1999). For instance, the prosecutor did not warn the jury that an acquittal would permit Mitchell to continue abusing the children or appeal to any civic duty of the jury. Instead, the prosecutor's statement focused on the central issue at trial—whether the children were credible witnesses. The prosecutor accurately indicated that, if the children were unbelievable, then the jury should acquit Mitchell, which would allow him to go free.

Notwithstanding, even if the prosecutor's comment were improper, the remark was isolated and did not mislead the jury as to the facts or the law, the jury was instructed that the arguments of counsel were not evidence, and there was sufficient evidence of Mitchell's guilt presented at trial. Accordingly, Mitchell cannot demonstrate that the prosecutor's remark infringed his right to due process. *See Gomez v. Biter*, No. 12-9681, 2014 WL 4828939, at *8 (C.D. Cal. Sept. 29, 2014) (finding state court did not unreasonably apply *Darden* where prosecutor argued to jury that not guilty verdict would permit defendant to "walk out those doors," but prosecutor's remark was "short" and jury was instructed to base its verdict on evidence presented at trial).

Lastly, Mitchell takes issue with the prosecutor's comment that, "All the children said they told their mom here in Jackson County [concerning the abuse], and nothing

happened. Sometimes you just give up." There was nothing improper about this argument. The prosecutor was permitted to explain, based on reasonable inference, why the children did not report the abuse to anyone other than their mother before being interviewed by Ms. Perez and Officer Kenny. Furthermore, the prosecutor's statement was in rebuttal to defense counsel's persistent impeachment of the children's credibility by emphasizing their failure to report the abuse to anyone, other than their mother, before their interviews.

Considering all of the prosecutor's purportedly improper remarks together, the undersigned concludes that the remarks did not "so infect[] the trial with unfairness as to make [Mitchell's] conviction a denial of due process." *Donnelly,* 416 U.S. at 643. Therefore, the undersigned **FINDS** that the state court's decision on this claim is not contrary to, or an unreasonable application of, clearly established federal law. Thus, the undersigned **RECOMMENDS** that ground for relief 2(F) be **DENIED**, and Respondent be **GRANTED** summary judgment on that ground of Mitchell's § 2254 petition.

### C. Judicial Misconduct

Mitchell's final two claims allege judicial misconduct. First, Mitchell argues in his petition that the trial court "many times showed deference strongly favoring the prosecution and aided the prosecution in its cause before and during the trial which denied [Mitchell] a fair and just trier of fact, and a fair trial." (ECF No. 2 at 17). Second, Mitchell contends that the trial court committed error and demonstrated bias when the court refused to rule on defense counsel's motion for a continuance when it was made (prior to jury selection) rather than during trial. (*Id.*) Mitchell's response memoranda do not elaborate on his claims of judicial misconduct; instead, he refers to the arguments contained in his state court filings. (ECF No. 26 at 62).

In his amended state habeas petition, with respect to his first judicial misconduct contention, Mitchell asserted that the trial court "convinced" the prosecutor to go forward with the sexual abuse charges despite C.O.'s testimony regarding the amount of alcoholic drinks she consumed. *Mitchell*, No. 2:14-cv-12761, Dkt. No. 15-2 at 157-59. For support, Mitchell primarily relied on the trial court's actions in rejecting the defense's motion for judgment of acquittal. Mitchell took issue with the court's statement that there was no evidence as to how much alcohol was in each drink consumed by C.O., an argument that the prosecutor later emphasized in responding to the defense's motion. *Id.* at 158-59. Moreover, Mitchell contended that, in considering the motion for acquittal, the trial court erroneously stated that C.O. never testified to "passing out" as a result of drinking alcohol on March 9, 2000. *Id.* at 159-60. Mitchell also insisted that the trial court's bias was exhibited when the trial court refused to *sua sponte* call Ms. Perez and Officer Kenny to testify at trial. *Id.* at 161.

As to his second judicial misconduct claim, Mitchell argued in the circuit court that the trial court erred in refusing to grant a continuance related to the State's 404(b) motion. *Id.* at 163. Separately, Mitchell insisted that the trial court allowed the prosecutor to make the misrepresentation that the State did not intend to introduce any 404(b) evidence at a pretrial conference four days before Mitchell's trial began. *Id.* at 164.

The circuit court rejected Mitchell's judicial misconduct arguments. As to Mitchell's first claim, after reviewing the record, the circuit court found that "the trial judge committed no acts during the course of the trial that prejudiced [Mitchell's] right to an impartial and neutral judge during trial." (ECF No. 10-1 at 20). Regarding Mitchell's second claim, the circuit court noted that the trial court granted the defense's motion for a continuance and recessed trial early so that defense counsel could prepare a response

to the State's motion. (*Id.* at 21). The circuit court pointed out that, before ruling on the motion, the trial court permitted the defense to call witnesses and make an argument. (*Id.*) Overall, the circuit court determined that the trial court exhibited no bias in its handling of the State's motion. (*Id.* at 22). The WVSCA adopted the circuit court's findings and conclusions on Mitchell's judicial misconduct claims. *Rodger M.*, 2015 WL 3952698, at *1.

Due process guarantees a criminal defendant's right to an impartial trial judge. *Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) (citing *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955)); *Montgomery v. Uchtman*, 426 F.3d 905, 910 (7th Cir. 2005) (citing same); *Layer v. Lyles*, 598 F. Supp. 95, 98 (D. Md. 1984). "The general presumption is that judges are honest and impartial." *Montgomery*, 426 F.3d at 910. In assessing judicial impartially, the Fourth Circuit has accepted that a judge is not merely a spectator at trial; rather, a judge must ensure that the presentations of counsel are not confusing to the jury and that trials do not become "protracted and costly affairs," even if that means that the trial judge must interrupt counsel. *United States v. Smith*, 452 F.3d 323, 332 (4th Cir. 2006); *see also United States v. Ecklin*, 528 F. App'x 357, 362 (4th Cir. 2013). "'A judge's ordinary efforts at courtroom administration-even a stern and short-tempered judge's ordinary efforts at courtroom administration' . . . do not establish bias or partiality." *United States v. Castner*, 50 F.3d 1267, 1274 (4th Cir. 1995) (quoting *Liteky v. United States*, 510 U.S. 540, 556, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994)). In addition, "judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge . . . they will do so if they reveal such a high degree of favoritism or

antagonism as to make fair judgment impossible" *Liteky*, 510 U.S. at 555.[10] A trial judge's participation during trial, however, should "never reach the point at which it appears clear to the jury that the court believes the accused is guilty." *Ecklin*, 528 F. App'x at 362 (citations and markings omitted); *see also United States v. Bencivengo*, 749 F.3d 205, 216 (3d Cir. 2014). Ultimately, "[t]o prevail on a claim of judicial misconduct, [Mitchell] must show that the state trial judge's conduct was so fundamentally unfair as to deprive [him] of [his] constitutional right to due process," and this task is an onerous one. *Paccione v. New York*, 353 F. Supp. 2d 358, 368 (E.D.N.Y. 2005).

In this case, the record is devoid of any evidence demonstrating prosecutorial favoritism on the part of the trial court. First, Mitchell's argument that the trial court acted improperly in ruling on the defense's motion for acquittal is entirely unfounded. The trial court's explanation of its reasoning for denying the motion for acquittal does not support Mitchell's claim of bias. To the contrary, the trial court's thoughtful analysis of the defense's motion supports the state courts' finding that the trial court acted in a fair and impartial manner. The prosecutor's later agreement with the trial court's reasoning is not evidence that the trial court favored the State, and there is no indication that the trial court "convinced" the State to go forward with any of the charges. Rather, the trial court applied the appropriate standard for reviewing a motion for acquittal, which requires the court to view the evidence in the light most favorable to the prosecution, and offered cogent reasons for denying the defense's motion for judgment of acquittal. *State v. Garrett*, 466 S.E.2d 481, 492 (W. Va. 1995).

---

[10] While *Liteky* concerned the federal recusal statute, federal courts have looked to it for guidance in resolving habeas claims of judicial bias. *See, e.g., Willis v. Lafler*, No. 05-74885, 2007 WL 3121542, at *22 (E.D. Mich. Oct. 24, 2007).

Similarly, even if the trial court erred in its summary of C.O.'s testimony concerning whether she "passed out," there is no reason to believe that the trial court's mistake was an intentional misstatement of the evidence designed to prejudice Mitchell.[11] (ECF No. 10-11 at 173). Moreover, C.O. testified that she did not "pass out" until after she had finished drinking alcohol. She stated that she eventually "passed out" on the couch and awoke in her bedroom a short time later, at which point Mitchell entered her room and sexually abused her. (*Id.* at 44-48, 63-64). As such, any mistake by the trial court in summarizing C.O.'s testimony as to whether she "passed out" was of little significance to the trial court's ultimate decision denying the defense's motion for acquittal.

Additionally, the trial court had no responsibility to *sua sponte* call witnesses on Mitchell's behalf. *See United States v. Cecil*, 836 F.2d 1431, 1444 n.6 (4th Cir. 1988). Consequently, Mitchell's assertion that the trial court exhibited bias by failing to call Ms. Perez and Officer Kenny to testify is meritless. In sum, the three examples that Mitchell cites in support of his first judicial misconduct claim are not evidence of judicial bias at all.

Turning to Mitchell's second judicial bias claim, he argues that the trial court exhibited bias in (1) refusing to rule on defense counsel's motion for a continuance at the time that the motion was made and (2) allowing the prosecutor to represent to the court at a pretrial hearing that the State did not intend to offer any 404(b) evidence. Beginning with his first sub-argument, Mitchell has not explained how the trial court's delay in ruling on the motion for a continuance exhibited bias. Moreover, the court initially denied the defense's motion to continue the trial, but the court later recessed the trial early so

---

[11] Of course, the trial court's statements regarding the evidence were not made in front of the jury.

that defense counsel could investigate and prepare a response to the State's motion. Before ruling on the motion, the court allowed defense counsel to cross-examine the State's witnesses, offer witness testimony, and make an argument. As such, the trial court acted fairly in permitting the defense time to prepare to address the State's motion and did not demonstrate bias in its treatment of the motion.

Next, there is no evidence that the trial court knew the State intended to present 404(b) evidence, but failed to disclose its intention at the pretrial conference. Consequently, Mitchell's claim that the trial court permitted the prosecutor to misrepresent the issue is baseless. In addition, as an alternative to the trial court's admissibility ruling under 404(b), the trial court separately found that the evidence was admissible under West Virginia Rule of Evidence 403 because Mitchell's acts (permitting C.O. and V.O. to miss school and drink alcohol) were part of a "single criminal episode." (ECF No. 10-10 at 186). As such, in its alternative admissibility finding, the trial court concluded that evidence was not 404(b) evidence, even though labeled as such by the State.

Other than the previously discussed instances, which do not support Mitchell's claim of judicial bias, Mitchell has not cited any other evidence in support of his judicial misconduct claims. Having reviewed the record, the undersigned **FINDS** that the state court's decisions on Mitchell's judicial misconduct claims are not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the undersigned **RECOMMENDS** that grounds for relief 3(A) and 3(B) be **DENIED**, and Respondent be **GRANTED** summary judgment on those grounds of Mitchell's § 2254 petition.

## IV.    Proposal and Recommendations

The undersigned respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** as follows**:**

1. Petitioner's letter-form motion to withdraw his Motion for a Ruling of Default, (ECF No. 31), be **GRANTED**, and Petitioner's Motion for a Ruling of Default, (ECF No. 30), be **DENIED** as **withdrawn**;

2. Respondent's Motion for Summary Judgment, (ECF No. 10), be **GRANTED**;

3. Petitioner's Petition for a Writ of Habeas Corpus by a Person in State Custody, (ECF No. 2), be **DENIED**; and

4. That this action be **DISMISSED, with prejudice**, and removed from the docket of the court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Petitioner shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to Petitioner, Respondent, and any counsel of record.

**FILED:** June 30, 2016

Cheryl A. Eifert
United States Magistrate Judge